UNITED STATES, Appellee

v.

CHARLES F. SIMMONS, Sergeant, U. S. Army, Appellant

1 USCMA 691, 5 CMR 119

No. 505

Decided September 26, 1952

LT. COL. Stewart H. Legendre, USA, and 1ST LT. Patrick H. Thiessen, USA, for Appellant.

LT. COL. Thayer Chapman, USA, and 1ST LT. Richard L. Brown, USA, for Appellee.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

Petitioner was tried by a general court-martial for willfully disobeying the lawful command of a superior officer; for simple assault, and for wrong-fully discharging a firearm under circumstances such as to endanger human life, in violation of Articles 90, 128 and 134, respectively, Uniform Code of Military Justice, 50 USC §§ 684, 722, and

**692**

728. He was found guilty of all the charges and specifications and sentenced to be dishonorably discharged from the service, to forfeit all pay and allowances, and to be confined at hard labor for ten years. The finding and sentence were reviewed and upheld by both the convening authority and an Army board of review but The Judge Advocate General of the Army subsequently suspended the unexecuted portions of the sentence. We granted review to determine whether the law officer erred to petitioner's prejudice in failing to instruct more completely on the alleged and included offenses.

The petitioner argues four assignments of error. He contends that the law officer erred in the following particulars: by failing to include all the necessary elements of the offense of willfully disobeying a superior officer, by not instructing on the lesser included offense of failure to obey the order of a superior officer, and by incorrectly instructing on the offenses of simple assault and careless discharge of a weapon under circumstances such as to endanger human life. Before discussing these contentions, we relate generally the facts which brought about this prosecution.

On the day of these alleged offenses the petitioner, then acting first sergeant of his battery, and another soldier, dismounted from a jeep parked near the company orderly tent. They proceeded inside the tent and petitioner demanded from the battery clerk a vehicular trip ticket to Uijongbu, Korea. Offended by a refusal of his demand he then directed the clerk to give him his (petitioner's) carbine. Once again his demand was refused. He then drew his .45 calibre side arms, cocked it and repeated his last order. This time the clerk complied. Taking the carbine, petitioner, after first stating that if no one would give him a trip ticket he would shoot, then fired two rounds from this weapon. The weapon was pointed towards the dirt floor but the slugs hit uncomfortably close to another sergeant standing in the tent. Petitioner then left the company orderly tent and proceeded to the supply tent in a further search for a trip ticket. When

told none was available he fired another round from his carbine and backed out the entrance. Half an hour later he reappeared at the supply tent and demanded ammunition from the supply clerk. On being informed that ammunition was not on hand, he stated that he knew ammunition was available and that he wanted some. During this conversation with the supply clerk, petitioner had his .45 calibre pistol in his hand waving it back and forth. Because of fear of being shot, the clerk complied with the demand and handed petitioner some ammunition.

The reports from the rounds fired by petitioner were heard by officers of his battery, one of whom, on orders from the battery commander, accompanied by another battery officer, proceeded to investigate. In carrying out the assignment they immediately went to the orderly tent. First Lieutenant Ford, the officer who was ordered to investigate and who issued the order involved, was dressed in fatigue clothes but was wearing his pistol belt, helmet and insignia of rank. Shortly after the officer had arrived the petitioner entered the orderly tent. The lieutenant then queried petitioner as to who had fired the shots in the area. In reply petitioner stated that he had fired two or three shots in the mess hall for the purpose of clearing the hall of the men then inside. Thereupon, Lieutenant Ford ordered petitioner to surrender his side arms which he was then holding in his right hand. Petitioner not only refused to comply with the order, he went a little further and ordered everyone to stay back if they wanted to remain healthy.

Both officers stated that in their opinion petitioner was under the influence of liquor during the time involved. However, Lieutenant Ford was of the opinion that petitioner's faculties were not impaired to such an extent that he could not comprehend the seriousness of his offense. In addition, the officers testified to petitioner's efficiency as a soldier, his good conduct and his having been, shortly before trial, recommended for a battlefield promotion.

After the Government rested its case, petitioner testified in his own behalf.

**693**

He stated that on the day in question he had consumed a variety of intoxicating liquors; so much so that he had no recollection of the events related by the prosecution witnesses. He remembers drinking sometime prior thereto, but claims to have "blacked out" and to have remained in that condition until the military police aroused him from his sleep.

The law officer in instructing on the offense of willful disobedience followed the precise wording of the Manual and informed the court-martial that in order to return a finding of guilty it must find: (a) that the accused received a certain command from a certain officer, as alleged; (b) that such officer was the superior officer of the accused; and (c) that the accused willfully disobeyed the command. Petitioner in his first contention argues that one element was omitted, namely: that the offender must know the order is from a superior officer.

Laying aside the Manual formulae, there can be no dispute over the question of whether one who █ commits this offense must have knowledge that the person issuing the order is his superior officer. That he must know has been the military rule over the years. Winthrop, Military Law and Precedents, 2d ed, 1920 Reprint, at page 577, says of an earlier article—a forerunner of article 90:

"To constitute the specific offence of disobedience of orders in violation of Art 21, the 'superior officer' must of course be *known to be such* by the accused, at the time of his giving the order which is not obeyed."

Furthermore, a review of past board of review decisions reveals that in those cases where a discussion of this principle may be found, the boards of review have recognized the necessity of finding proof of this element of the offense in order to sustain a conviction. See United States v. DeMasse & Monett, 39 BR 215, 223; United States v. Bowman, 25 BR 355, 360; United States v. Pagan, 13 BR 99, 101, and particularly, United States v. Snyder, 3 BR 39–40.

The rule announced in the foregoing

authorities is incorporated in the paragraph of the Manual for Courts-Martial, United States, 1951, discussing this particular offense. Section 169 (b), page 322, contains the following language "but the communication must amount to an order, and the accused must know that it is from his superior officer." If this were the █ only section with which we had to deal, we would have no hesitancy in holding that the law officer erred in not including knowledge when he instructed the court-martial on the proof necessary to convict. However, the Government advances two contentions which require answer. The first is that the instructions cover this element and the second is that other paragraphs of the Manual establish a pattern which shows lack of knowledge to be an affirmative defense and that accused should have requested an instruction if he desired the court-martial to be further informed on that subject.

It is our view that the instructions are insufficient in the particular contended for by petitioner. It will be observed that the word "willfully" is found in the third element and, while this may connote knowledge it appears to refer and be limited to the disobedience. There can be a knowing or willful disobedience of an order without there being knowledge, that the person issuing the order is a superior officer. The point we desire to make may be brought into bold relief by the use of an illustration. If we assume combat conditions and that officers are not wearing insignia, a superior officer may issue an order, an enlisted man could willfully and knowingly refuse to obey, and, yet not be guilty of the offense because he was not apprised of the fact that the person giving the order was an officer. It appears to us that in that hypothetical situation every element required to be found, by the instruction given, is present without the alleged offense having been committed.

On the second point, counsel for the Government make the argument that if we compare other provisions of the Manual with those controlling this offense and construe them in pari materia,

it necessarily follows that knowledge is an affirmative defense. Particularly, they refer to two statements concerning similar offenses. The first is found in Paragraph 168, which treats with disrespect towards a superior officer. The Manual at page 320 states that if an accused did not know that the person against whom the actual words were directed was his superior officer, such lack of knowledge is a defense. The second statement may be found in Paragraph 170 which discusses the offense of insubordinate conduct towards a noncommissioned officer. The Manual states the same rule as to that offense in slightly different language, but its meaning is substantially the same.

We are uncertain as to the true sense in which the framers of the Manual used the word "defense." They may have intended to cast the burden on accused to justify or excuse his refusal or they may have intended to merely restate the proposition that failure of the Government to prove that element is a defense available to the accused. In view of the long established rule in the military that to be guilty of the offense the disobeyer must know the issuer is an officer, we lean to the previously announced belief that knowledge is an element of the offense which must be proven by the Government.

Assuming, arguendo, that the Government's contention could be sustained, and that lack of knowledge was an affirmative defense which must be established by the accused, the question is still unanswered. There remains a determination of whether an instruction must be given on that issue without a request having been submitted by an accused. Under the facts in this case, there was an issue of knowledge because the evidence for the Government showed accused to be intoxicated; his own testimony indicated that he was so under the influence of liquor he "blacked out" and had no recollection of the events. From a factual standpoint, the duty of the law officer to instruct on an issue is not founded on whether he believes the story told by witnesses for the Government or by the accused, it is based on the necessity of giving the members of the court-martial a clear picture of what is in issue so that they can accept either version of the evidence and test it by the instructions given. Testimony of an accused is sufficient to make an issue and in this case there is evidence from which the court could have reasonably found that the petitioner was not cognizant of the fact that the order was issued by an officer.

While we have not specifically held that there is a duty on the part of the law officer to instruct on what might be clearly identified as an affirmative defense, we have suggested that a court-martial is insufficiently informed as to the law of the case without legal explanation of the defenses properly raised. See United States v. Ginn (No. 263), 1 USCMA 453, 4 CMR 45, decided July 10, 1952. In this case knowledge as an element of the offense, or lack of knowledge as an affirmative defense, is so closely interwoven into the pattern of the crime that the court-martial could not fairly determine petitioner's guilt unless told that in order to return a finding of guilty, it must find the accused knew he was being addressed by a superior officer. Assuming knowledge not to be an essential element it is a factual issue, which, if found in favor of an accused, does not excuse, justify or avoid the crime, but on the contrary establishes there was no crime and it is impracticable to disassociate it from other elements of the offense. In that situation the law officer has the responsibility of giving an instruction on that issue and the duty should be performed with or without a request. It follows that regardless of whether we view knowledge as an element of the offense or defense, the court-martial was not properly instructed.

Because of the fact that we are reversing the case for a different reason, we do not test the error previously discussed for prejudice. We do, however, suggest to the services that the Manual for Courts-Martial, United States, 1951, be corrected to show that in this type of offense knowledge is an element which must be included in the proof.

Petitioner's second assignment of error relates to the law officer's failure to instruct on the lesser ▉ included offense of failure to obey a lawful order of a superior officer. Petitioner properly argues that if there is no evidence from which the court-martial could reasonably find the specific intent—willfulness—necessary to convict of the major offense, then a lesser included offense which does not require that intent is in issue and requires instructions. See United States v. Clark (No. 190), 1 USCMA 201, 2 CMR 107, decided February 29, 1952; United States v. Roman (No. 191), 1 USCMA 244, 2 CMR 150, decided March 19, 1952; United States v. Quisenberry (No. 329), 1 USCMA 670, 5 CMR 98, decided September 9, 1952. Recognizing first that willful disobedience requires specific intent (see United States v. Bennett, 12 BR–JC 171, 173, citing CM 343259, Hale, 31 Oct 50; CM 234993, Orbon, 1 BR(ETO) 95, 105), and second, that drunkenness may negative specific intent (Manual for Courts-Martial, United States, 1951, paragraph 154, pages 294, 295; United States v. Roman, supra; United States v. Drew (No. 422) 1 USCMA 471, 4 CMR 63, decided July 23, 1952), we again call attention to the facts in the record which reasonably raise an issue of the lesser included offense. Both officers who were present when the petitioner was apprehended in the orderly room stated that in their opinion the accused had been drinking and was under the influence of alcohol. Petitioner's evidence of intoxication was much stronger. Further, both officers testified that his conduct during his escapade did not follow his usual behavior pattern and that this was the first time the accused had caused any trouble. Moreover, it was shown that he, as a sergeant, was performing the duties of the next higher rank; that his battery officers had recommended him for a battlefield commission which recommendation had been favorably considered by the battery commander; and that he was fully aware of his proposed advancement. These facts, when considered in connection with the na-

**696**

ture of the crimes of which he is here charged, may well have caused the members of the court-martial to conclude that accused's mental faculties were so impaired that he was incapable of forming a specific intent had they been so instructed. It matters not that the law officer in his instruction directed attention to the Manual in respect to drunkenness, for without being given the elements of the lesser offense, the members of the court-martial were left unguided on a material matter. They had three alternatives — either to find petitioner guilty of the greater, guess the elements of the lesser, or find him not guilty. Under similar circumstances we have held that the failure of the law officer to define the lesser included offense constitutes prejudicial error. Accordingly, we find petitioner's second allegation of error well taken.

Petitioner's third allegation of error questions, as a matter of law, the correctness of the law officer's instructions as to the remaining charges.

The specification of the first remaining charge reads:

"In that Sergeant Charles F. Simmons, U. S. Army . . . did . . . on or about 1 November 1951, assault Private First Class Robert Jackson by pointing a pistol at him in a threatening manner."

To this specification the law officer instructed the court-martial as follows:

"That the accused attempted or offered with unlawful force or violence to do bodily harm to a certain person, as alleged."

Not only is the specification worded to charge simple assault (Article 128 (a), Uniform Code of Military Justice, supra, also see sample specification, Appendix 6c), but the instructions give specifically only the elements necessary to this type of assault (Manual for Courts-Martial, United States, 1951, page 371). Under aggravated assault the necessary elements include (1) the use of a dangerous weapon and (2) its use in a manner likely to produce death or great bodily harm (Man-

ual for Courts-Martial, United States, 1951, pages 207, 373). The naming in the specification of force and violence does not supply the essential elements of aggravated assault as listed above. Moreover, the instruction does not mention those elements but instead conforms strictly to those required for proof of the lesser offense. We, therefore, disagree with petitioner's contention that the law officer's instructions on this charge are erroneous as a matter of law.

The specification of the last charge reads:

"In that Sergeant Charles F. Simmons, U. S. Army, . . . did . . . on or about 1 November 1951, wrongfully discharge a firearm, to wit: a carbine, under circumstances such as to endanger human life."

The instruction which the law officer gave on this offense was as follows:

"That on the date and under the circumstances alleged, the accused did wrongfully discharge a firearm, to wit: a carbine, under circumstances such as to endanger human life."

The Uniform Code of Military Justice, Article 134, supra, does not specifically define this offense. ██ It comes to our attention only by virtue of a single sentence in the Manual at pages 381 and 382 which states that the careless discharge of a firearm is disorder and neglect contrary to Article 134 of the Code. However, the chart or sample specification in Appendix 6c, page 491 of the Manual provides for two distinct offenses, (1) willful discharge of a firearm under circumstances as to endanger life and (2) careless discharge of a firearm. The Table of Maximum Punishments, Manual for Courts-Martial, United States, 1951, also makes this same distinction for at page 226, willful discharge so as to endanger human life, carries a penalty of a dishonorable discharge and confinement at hard labor for one year, while a careless discharge of the weapon may be punished by only three months' confinement at hard labor and forfeiture of two-thirds pay for the same period. In addition the specifications mentioned in the few available board of review cases seem to indicate two separate offenses. (United States v. Whitley & Douglas, 76 BR 15–21; United States v. Jackson, 73 BR 331, 336; United States v. Reeves, 14 BR 285, 289).

From the form of the specification used, it seems apparent that a charge of the greater offense was intended. Further, the facts of the case permit a finding of the greater for we find that the petitioner discharged his carbine in a tent in which other persons were present. The fact that he fired the shot with the weapon pointed towards the ground does not dispose the potential danger to the other soldiers present.

The sentence imposed by the court-martial throws no light on the offense considered by the court-martial, for the other offenses of which petitioner was found guilty will support the sentence. We are thus unable to determine whether the court-martial used the greater or lesser offense as a yardstick for assessing punishment but we believe it probable it was the greater. If so, it is readily apparent that the instruction is incomplete for that offense in that the essential element of *willfulness* is not set forth. There being a reasonable probability that the petitioner was found guilty of a greater offense on the elements of a lesser, it is obvious that prejudice is present.

The findings as to simple assault are affirmed and the others are reversed. The sentence is set aside and the cause remanded to The Judge Advocate General of the Army for disposition not inconsistent herewith.

Chief Judge QUINN and Judge BROSMAN concur.