UNITED STATES, Appellee

v.

CLARENCE T. AMDAHL, Private First Class, U. S. Army, Appellant

3 USCMA 199, 11 CMR 199

LT COL Stewart H. Legendre, U. S. Army, for Appellant.
LT COL Thayer Chapman, U. S. Army, and CAPT Irvin M. Kent, U. S. Army, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused was tried by general court-martial in Korea upon charges of robbery of a Korean civilian in violation of Article 122, Uniform Code of Military Justice, 50 USC § 716, and premeditated murder of a Republic of Korea soldier in violation of Article 118, 50 USC § 712. He pleaded not guilty to each charge, and was found not guilty of robbery but guilty of premeditated murder. The court then sentenced him to dishonorable discharge, total forfeitures and confinement at hard labor for life. The convening authority approved, and the board of review affirmed the findings and sentence, but The Judge Advocate General of the Army, reduced the term of confinement to twenty years.

We granted the accused's petition for review to test the sufficiency of the instructions relative to the elements of proof, and to determine whether the issue of self-defense was reasonably raised by the evidence.

The nature of the issues requires a complete recitation of the facts. On the afternoon of July 18, 1951, the accused stopped an elderly and somewhat drunken Korean on a mountain trail. After searching him, he took a sum of money from him. According to the Korean the money was taken without his consent. As to this point the accused testified he had taken the sum in payment for shoes which the Korean had purchased from him. This incident formed the basis of the robbery charge of which the accused was ac-

**200**

quitted. Thereafter, both sat under a tree talking pleasantly, until they were joined by a male Korean school teacher. The accused demanded the teacher's pass. After it was produced and examined, he too joined in the jocular conversation. Finally, a Republic of Korea soldier, hereinafter referred to as the deceased, approached the group and the accused demanded that he produce his pass. The deceased did not comply. To this point, the prosecution and the defense testimony were in complete accord. A sharp conflict, however, was presented in the respective versions of the events which next ensued. The two Koreans testified that upon the failure of the deceased to produce his pass, the accused's face reflected anger. He arose and seized the deceased by the arm. After a brief struggle, the accused fired two shots at the deceased who fell slowly to the ground. When he tried to regain his feet, the accused, taking careful aim, fired another round into his head. The testimony of the accused and his pretrial statement were in substantial accord. He asserted that he had been hunting hawks in the hills and had stopped to rest before returning to his organization. He met the two Korean civilians and had asked each for a pass. Satisfied as to their identity, he talked to them in a friendly manner, until a Korean soldier approached the group. The accused then demanded his pass. He explained that he was prompted to do this by his recollection of talk of communist infiltration behind the lines, and he wanted to assure himself of this soldier's identity. When the de-

ceased made no response, the accused started to return to his organization. He then noticed that the deceased had turned and had started down the trail behind him. At this, he turned and once more demanded the soldier's pass. When the deceased again failed to reply, he became alarmed and turned to request the school teacher's aid as an interpreter. The deceased then seized his arm, and, in perfect English said, "Come on." The accused shook him off and stepped back. As he did so the deceased took his carbine from his shoulder, and, as he worked the bolt, the accused fired his carbine twice. He then wrenched the deceased's carbine from his grasp and threw it over his head. Thereafter he fired a final shot at the deceased.

Post-mortem examination of the deceased revealed four bullet wounds, located in the thigh, abdomen, chest and head. Death could have resulted from either of the latter wounds.

At the conclusion of the trial the law officer instructed the court on the elements of the offense of premeditated murder as follows:

"The court is further advised that the elements as to the offense charged in Charge II and the specification thereunder are as follows:

a. That the victim named or described is dead;

b. That his death resulted from the act or omission of the accused, as alleged; and,

c. That the facts and circumstances showing that the accused had a premeditated design to kill.

"As to the correct meaning of premeditation, I direct the court's attention to paragraph 197(d) on page 352, Manual for Courts-Martial, 1951."

## II

It is clear that a law officer inadequately discharges his duty to instruct the court on necessary matters by a mere reference to an applicable paragraph of the Manual for Courts-Martial. United States v. Strong (No. 244), 1 USCMA 627, 5 CMR 55, decided August 27, 1952. However, in the absence of a positive duty to instruct, such a reference may not be considered erroneous. This is true in the instant case with reference to advertence to the Manual for the definition of premeditation. While we feel that law officers should, as a matter of policy, define such technical terms as "premeditation," we will not reverse for failure to do so, in the absence of a specific request by the defense counsel based upon the presence of special circumstances arising from a peculiar factual situation. United States v. Day (No. 703), 2 USCMA 416, 9 CMR 46, decided April 30, 1953. No such request was made; nor were special circumstances found in the record requiring such an explanation in the absence of a specific request therefor. Accordingly, we hold that the law officer did not fail to instruct the court sufficiently as to the elements of proof.

## III

In United States v. Ginn (No. 263), 1 USCMA 453, 4 CMR 45, decided July 10, 1952, we declared:

". . . . The obvious intendment of Article 51(c) is to provide the court with the framework of legal issues to which the evidence must be fitted in order to render intelligent findings. . . . . ."

We concluded from this premise that a court-martial must be instructed as to the circumstances which will reduce murder to excusable homicide, only when it clearly appears that a sound theory of justification is presented by the evidence. We reiterated this conclusion in United States v. Charles F. Simmons (No. 505), 1 USCMA 691, 5 CMR 119, decided September 26, 1952, adding:

". . . . From a factual standpoint, the duty of the law officer to instruct on an issue is not founded on whether he believes the story told by witnesses for the Government or by the accused, it is based on the necessity of giving the members of the court-martial a clear picture of what is *in issue* so that they can ac-

**201**

cept either version of the evidence and test it by the instructions given. . . ." [Emphasis supplied].

Tested by these principles the evidence presented to the court in this instance did not reasonably █ raise the issue of self-defense. It was established by the testimony of all the witnesses to this unfortunate slaying that after wounding the deceased mortally, and disarming him, the possibility of harm resulting to the accused at the hands of the deceased was remote, if not impossible. The deliberate careful firing of a final bullet into the head of the deceased under these circumstances entirely destroys his claim of justifiable homicide. In Burnaman v. State, 70 Tex Crim Rep 361, 159 SW 244, 248, it was held that a slaying committed after the danger has ceased to exist cannot be excused on the ground of self-defense. The court therein declared that a person loses his right to shoot again in self-defense after firing a shot which has so disabled his assailant that there is no longer any apparent danger. In the instant case it should be observed that having fired three bullets into the body of the deceased, the accused snatched his carbine from his grasp, and watched him slump helplessly to the ground. As the victim attempted to rise, the accused deliberately aimed a final shot at his head, killing him.

Rather than raising the issue of self-defense, the evidence of the final shot, establishes premeditated murder. In Reece v. State, 115 Ga 350, 116 SE 631, the defendant, charged with murder, contended the killing was in self-defense. Commenting on evidence that after the killing the defendant was restrained from driving a wagon over the body of the victim, the Supreme Court of Georgia declared such evidence showed the state of the defendant's mind at the time of the killing. In Harris v. State, 155 Ind 265, 58 NE 75, it appeared that having fatally wounded his victim, allegedly in self-defense, the defendant fired again when the victim was staggering away from him. The Supreme Court of Indiana declared that upon such evidence of the perpetration of a deliberate and cruel act, malice could be inferred, however suddenly performed. We conclude that the available evidence establishes premeditated malice, and precludes entirely the possibility of any reasonable theory of self-defense. United States v. Furney (No. 1008), 2 USCMA 270, 8 CMR 70, decided March 5, 1953.

Since the affirmative defense was not fairly in issue, instructions thereon were not required. The second issue is therefore answered in the negative.

Judges LATIMER and BROSMAN concur.