UNITED STATES, Appellee

v

FRANK HARRIS, JR., Private E-2, U. S. Army, Appellant

6 USCMA 736, 21 CMR 58

737

No. 6930

Decided March 30, 1956

*Captain Frank C. Stetson* argued the cause for Appellant, Accused.
*First Lieutenant Arnold I. Burns* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton,* and *First Lieutenant Howard S. Marcu.*

### Opinion of the Court

GEORGE W. LATIMER, Judge:

This case involves an 18-year-old youth with an excellent military rec-ord and no known civilian criminal past. The testimony shows him to have been mentally balanced and not substantial-

**738**

ly under the influence of liquor at the time of the homicide. He was friendly with the victim and his reputation for being a peaceful soldier was established. In the light of those facts and circumstances, it is most difficult to find any reason, excuse, or motive for this gruesome killing. Even the claim of self-defense seems baseless when tested by the number and nature of the wounds inflicted. Unfortunately for the accused, his frenzied behavior resulted in a conviction before a general court-martial of premeditated murder and a sentence to death. The convening authority approved both findings and sentence. A board of review in the office of The Judge Advocate General of the Army considered, among other things, the factual issue of premeditation and affirmed the findings made by the court-martial. Pursuant to Article 67(b)(1), 50 USC § 654, the case is now before us on mandatory review. Several errors have been assigned by appellate defense counsel, and because one of them involves the sufficiency of the evidence to sustain a finding of premeditation, a detailed recitation of the facts giving rise to the charge will be made.

The accused is a member of the Negro race and the deceased was a Caucasian. On the night of the homicide, they were drinking together in the enlisted men's mess hall at the Ikego Ammunition Depot in Japan. Some few days previous to the incident herein involved, the accused had been assigned to another unit but had returned to spend the weekend with his organizational friends. The deceased, Corporal Vaughn, had been detailed to act as charge of quarters, he was to remain in the mess hall all night, and the accused had been invited to spend the night with him. During the evening, a number of soldiers came into the mess hall for a late snack and were served by the deceased and the accused. One of these men, a Corporal Terrill, had a brief run-in with the latter. While attempting to go into the kitchen, Terrill brushed by the accused, who made a certain remark. As Terrill started to walk past, another soldier yelled, "Watch it," and as Terrill turned around, he saw the accused with a knife in his hand, held shoulder high, about two feet away from his neck. He inquired as to what was the cause of the behavior and the accused did not answer. He merely smiled, laid the knife down, and later apologized. Soon after this incident, the soldiers departed and left the accused and the deceased alone in the mess hall.

Approximately two hours before midnight, a Japanese boilerman named Otani was walking along the road outside the mess hall, checking the steam pressure in the boilers. He peered through a window of the building and noticed that a white soldier (deceased) and a colored soldier (accused) seemed to be either "joking" or "fighting." The colored soldier had his hand on the chest of the white soldier and was holding a knife behind his back. As the two men faced each other, the white soldier suddenly pushed away from the colored soldier and ran into the dining room, which was unlighted. The colored soldier immediately followed after him with the knife in his hand. The blade of the knife was at least six inches in length. Otani reported the incident to another Japanese national who was on duty as guard.

In the meantime two Army Security guards had been told of a disturbance in the mess hall. They were in the process of investigating the report and had stopped to glance through a window of the mess hall. The accused approached them and asked if they were trying to enter the building. The guards replied that their purpose was to investigate a purported fight in the building and Harris volunteered the information that he did not know anything about such a fight. In addition, he stated that Corporal Vaughn had asked him to wait until he returned from taking his girl friend home. To assist them, he offered to go over to the company barracks and obtain the keys from the mess hall so that the guards could enter the structure. The accused then left, saying that he would get the keys, but he never returned.

Two Japanese security guards, who also had been called to the scene, found an unlocked door and entered the mess hall where they found the body of the

739

deceased lying on the floor in the dining room near a steam table. At approximately 11:00 p.m., a medical officer, who had been summoned, arrived and he pronounced the victim dead. He estimated death to have occurred sometime within the two-hour period immediately preceding his arrival. In his opinion, death was caused by twelve cuts scattered over the anterior chest and shoulder on the left side of the body and about eight "slashing" wounds on the right side of the neck. There were also five penetrations on the back, particularly in the upper chest and lumbar area, and a few tiny scattered cuts on the left hand, upper left arm and shoulder. In all, the doctor noted a total of some 28 wounds which were caused by a sharp instrument.

Blood covered the floor of the mess hall in the area where Vaughn's body was found, and bloody footprints were observed from the area immediately surrounding the body to the doorway into the kitchen. On the morning after the stabbing, a bloody knife with a six-inch blade was found stuck in the ground, behind a fence post, near one of the mess hall doors.

After being apprehended, the accused gave a voluntary pretrial statement which was introduced into evidence. In the statement he admitted stabbing the deceased but claimed that he did so because the victim grabbed him by the neck and was choking him. After the struggle, he became frightened and ran out the side door of the mess hall. He did not know how many times he stabbed the deceased, and he did not know where he had concealed the knife. After leaving the mess hall, he boarded a train and rode to Yokohama. He spent the night in the barracks of a camp near that city, and the next morning went to the Chaplain.

The defense introduced testimony to show that the accused and the deceased were close acquaintances and were on friendly terms. The accused himself elected to take the stand in his own behalf, and testified substantially in accord with what he had said in his pretrial statement. Stated in general terms, his evidence was that he and

the deceased had been drinking together in the mess hall when they became involved in an argument. He was a "little bit high" but he was not drunk. Because of some words between the two, he started to leave, but the deceased called him back to have another drink. Then Vaughn suddenly grabbed him around the neck and shoulders and threw him on the side of the table. He protested but Vaughn continued to try to put pressure on his neck. At this point he observed the knife, grabbed it, once more asked the deceased to stop, and then stabbed him twice. As he looked up he saw the deceased running out of the kitchen to the dining room. Becoming dizzy, he got frightened and started to run. The next thing he remembered was waking up on a train in Yokohama, after which he became dizzy again. Sometime later, he awakened in a barracks in Camp Coe. He spent a confused day at the camp, and late in the afternoon he entered an office and asked to use the telephone. On the desk he noticed a "stop and hold sheet" on himself. The next day he went to confession at a Chaplain's office, and, after talking with that officer, he voluntarily surrendered himself to the military police.

In support of his assertion that the findings and sentence should be reversed, appellate defense counsel first contends that the evidence is insufficient to support a finding of premeditation. We are unable to agree with this contention. The facts of the case disclose a savage killing in which the body of the victim was covered with approximately 28 slashes on the back, chest and neck. Several of these wounds penetrated the back and chest cavity to a depth of one inch, and the severity of the stabbing resulted in the laceration of a large artery and the jugular vein in the victim's neck. The accused contends he was seeking to defend himself, but the circumstances surrounding the discovery of the body, and its horribly mutilated condition, are quite clearly inconsistent with that theory. Admittedly, there is evidence that the accused and the deceased had previously been on friendly terms, but there is

also testimony that the two had engaged in an argument shortly before the homicide, and they were bragging about their physical prowess. In fact, the accused himself admitted as much. It could be that a combination of liquor and anger precipitated the altercation, but accused contends he was not drunk and that he was thinking clearly until the deceased was stabbed. Prior to the killing, he and the deceased were observed facing each other in the mess hall during which time the accused held a knife behind his back. He was wearing a long overcoat or raincoat. Then as the victim turned and ran toward the kitchen the accused was seen to pursue him. There is no testimony from any disinterested witness that deceased had any hold on the accused. On the contrary, the Japanese guard said the accused stalked the deceased around a table in the kitchen, and then placed his hands on the chest of the victim. When the facts concerning the altercation were reported to the security guards they sought to enter the building. Finding the door locked, they went to the window and were met by the accused under conditions tending to show that he was attempting to establish an alibi. He had doffed his overcoat, perhaps because of its bloody condition, was not unduly excited, gave no inkling that he had been involved in an encounter, and, in fact, expressly denied that he had heard of any fight. Furthermore, he admittedly fabricated a story which would exonerate him; fled the scene under the pretext that he would obtain keys so that the guards could enter the mess hall; and then left the camp. Moreover, he had the presence of mind to conceal the murder weapon behind a nearby fence post. Although he denied hiding the knife in question, he admitted killing the victim with a weapon of similar description, and he could not account for its disposition. Lastly, at 11:00 p.m., which must have been shortly after the killing, he requested one of his buddies to awaken him at four o'clock the next morning. At that time, he made no mention of any difficulty with the deceased.

When the above facts are considered together with the evidence of the almost unbelievable brutality of the stabbing, there is sufficient evidence to support the findings. The killing is admitted, and so the only questions left to the court-martial for determination were: Was it consciously conceived? Were there facts which would reduce it to manslaughter? Was it justified? The last two theories were presented to the court-martial under appropriate instructions, and those issues were resolved against the accused. True it is that the court-martial might have returned a verdict on either of those theories, but that does not become the question of importance in this setting. Here we are faced with measuring the evidence to see if it will, as a matter of law, support the conviction returned. In addition to the facts we have previously related, we have these circumstances: There was plenty of time for the accused to form a specific intent to kill and to give consideration to the acts of stabbing. He was sane, partially intoxicated, and bragging about his physical capabilities. He was the larger of the two participants, and while he claims to have blacked out after the second stabbing, he remembers well the events prior to that time, and his mind was functioning when he planned his concealment of the weapon, alibi and flight. The vicious assaults resulting in multiple grievous injuries bespeak a premeditated design to kill, United States v Riggins, 2 USCMA 451, 9 CMR 81, and concealment and flight are indicia of a guilty mind and a consciousness of wrongdoing.

We are not impressed by the accused's claim of self-defense, nor is it surprising that the court-martial rejected it, for his story is contradicted by one eyewitness who observed the accused and the deceased just prior to the homicide, and who testified that the accused was the aggressor. The record is barren of any evidence that the deceased was armed with any sort of a weapon or that the taking of his life was necessary to prevent serious injury to the accused. The latter was somewhat larger than the victim, a fact which tends to weaken the former's

claim that he needed to use a deadly weapon to prevent Vaughn from choking him. Since the accused's attempt to excuse the killing on the ground that he acted only to save his own life is refuted by most of the circumstances, and because these circumstances furnish substantial evidence of premeditation, we hold that the court-martial was justified in returning findings of guilt of premeditated murder.

Appellant's second claim of error is that the law officer erred by admitting evidence of an absence without authority on the part of the accused. The record reveals that, over objection by defense counsel, the law officer admitted into evidence a certified extract copy of a morning report. This exhibit showed that the accused had absented himself without proper authority on the day following the homicide and that he was returned to military control one day later. Appellate defense counsel claims that the admission into evidence of the contents of that document violates the general rule that evidence of other crimes committed by an accused, but not alleged against him, is inadmissible.

There is no merit to this contention. Although it is true that the document brought to the attention of the members of the court-martial that the accused had committed a minor offense with which he was not charged, such evidence is admissible to show the accused's consciousness of guilt. As the Supreme Court of the United States has observed in Allen v United States, 164 US 492, 499, 17 S Ct 154, 41 L ed 528 (1896):

". . . Indeed, the law is entirely well settled that the flight of the accused is competent evidence against him as having a tendency to establish his guilt."

Military law has recognized the principle that fleeing from the scene of the crime may be considered as touching on the evidence of guilt. United States v Amdahl, 2 CMR 406, aff'd 3 USCMA 199, 11 CMR 199. In fact, that principle is so well established that it has been suggested that courts should not even consider a bill of exception so presumptuous as to raise the question. Wigmore, Evidence, 3d ed, § 276. An exception to the rule cannot be manufactured out of these facts, as the accused's absence without leave immediately after repeatedly stabbing his former friend could be regarded as a strong indication of guilt. Of course, it can be argued that his departure stemmed from some reason other than a consciousness of having committed an offense, but he admitted from the witness stand that he realized he had done "something terrible" and that he was afraid. That concession, together with the evidence of flight, would have a tendency to weaken his plea of self-defense. Certainly then, the evidence of unauthorized absence from duty was admissible as it served a purpose other than one of bringing to the court-martial's attention the commission of a separate crime.

It is next contended by appellate defense counsel that the law officer erred in permitting Corporal Terrill to testify that, shortly before the homicide occurred, the accused threatened him with a knife similar to that found near the scene. Again, we cannot agree with the appellant's assertion. We have held on prior occasions that there are exceptions to the rule forbidding the introduction of evidence showing prior misconduct. We said as much in United States v Pavoni, 5 USCMA 591, 18 CMR 215:

"There are a good many exceptions to the rule excluding evidence of prior offenses by an accused, and we have had occasion in prior cases to delineate some of these exceptional areas. In other fields civilian cases have discussed the variations. Thus, evidence of an offense not charged is admissible when it tends to identify the accused as the perpetrator of the act with which he is charged, United States v. Marshall, 2 USCMA 54, 57, 6 CMR 54, 57; when it shows guilty knowledge, intent, or a course of criminal conduct, United States v. Jones, 2 USCMA 80, 6 CMR 80; United States v. Deller, 3 USCMA 409, 419, 12 CMR 165; United States

v. O'Neil, 3 USCMA 416, 417, 12 CMR 172. . . Furthermore, there is overwhelming Federal authority to support the proposition that 'evidence which incidentally reveals the commission of a crime other than the one named in the indictment may . . . be received if it tends to . . . rebut an issue raised by the defense.' Bracey v. United States, 142 F 2d 85, 90 (CA DC Cir 1944), cert den 322 US 762, 88 L ed 1589, 64 S Ct 1274; Behrle v. United States, 100 F 2d 714, 715 (CA DC Cir 1938), and our adherence to this exception in an appropriate case has been foreshadowed. United States v. Brumfield, 4 USCMA 404, 408, 15 CMR 404, 408."

The fact that the accused shortly before the fatal encounter had brandished a similar weapon toward another soldier is certainly relevant to the issues in this case. We need mention no more than one reason for that conclusion. The fact shown tends to rebut the claim of self-defense, for it tends to show that accused may have been the aggressor. Implicit within the accused's claim of self-defense was the concept that he would never have resorted to the use of a deadly weapon had he not sincerely believed that he was in danger of death or grievous bodily harm at the hands of the victim. With the case in that posture, the Government was clearly entitled to show that the accused had, at a time near the time of the death, stood ready to use the very same deadly weapon in the absence of any apprehension of harm whatsoever. Evidence concerning the incident involving Terrill was therefore admissible, for it tended to rebut the issue raised by the accused.

The appellant next contends that the law officer erred by not giving certain instructions requested by defense counsel at the trial. The two requested instructions are as follows:

"The existence of friendship between Vaughn and the accused and the lack of proof of motive should be considered by the Court as to whether an offense was committed or the degree of any offense."

"The voluntary surrender by the accused when he learned he was wanted in connection with this incident should be considered as evidence of innocence."

We note at the outset that the law officer gave complete instructions covering the elements of the offense of premeditated murder, the elements of the lesser included offenses of unpremeditated murder and voluntary manslaughter, as well as the standards of proof for determining each, the issue of self-defense, the possible effect of intoxication upon the accused's mental capacity to premeditate and formulate a specific intent to kill, the inferences to be drawn from evidence of the accused's good character, and reasonable doubt, the burden of proof, the presumption of innocence, and the court-martial's duty to weigh the evidence and to determine the credibility of witnesses. It is, therefore, clear that appropriate legal standards to measure all matters in issue were presented to the court-martial.

Notwithstanding the instructions given, appellate defense counsel insists that the law officer should have pointed out particular matters of evidence by giving the separate requested instructions. In Coffin v United States, 162 US 664, 16 S Ct 943, 40 L ed 1109 (1896), the Supreme Court was presented with a contention embodying a similar principle, and observed, at page 675:

"The accused could not properly single out the absence of one of several possible motives for the commission of an offense, isolate it in an instruction from all the other facts of the case, and demand that the court instruct the jury as to the weight to be given this particular fact, independent of all the other proof in the case. The charge as a whole having correctly conveyed to the jury the rule by which they were to determine from all the evidence the question of intent, we think there was no error to the prejudice of the defendant in refusing the request which he asked."

We think that the Supreme Court's

holding in this regard not only announces the rule for the Federal civilian courts but sets out a principle which should be followed in military law. Certainly a law officer in a court-martial cannot be required to give instructions which would attach unwarranted prominence to each bit of evidence presented in favor of one of the parties. If this were not so, instructions would become a mixture of magnifications. Civilian courts frown on such a confused method of presenting the real issues, and, indeed, the weight of Federal authority seems to hold that if the trial judge thoroughly instructs the jury on the material matters, the emphasizing of particular facts by special instructions will often mislead a jury as to their relative importance, and that should be avoided. See Perovich v United States, 205 US 86, 27 S Ct 456, 51 L ed 722 (1907). A law officer already has the burden of giving the law of the case to the court, and we are unwilling to saddle upon him the added and unwarranted burden of giving instructions upon each item of evidence which the defense chooses to select from the facts elicited at trial.

The contents of the second requested instruction point up the difficulties which would be encountered if a different principle was adopted. It would have required the law officer to instruct the court that it must consider voluntary surrender as evidence of innocence. First, we should note that a great majority of jurisdictions exclude altogether evidence of conduct which allegedly shows a consciousness of innocence, except to rebut evidence tending to show consciousness of guilt. American Tobacco Co. v United States, 147 F 2d 93, 120 (CA 6th Cir) (1944); State v Teitle, 117 Vt 190, 90 A 2d 562, 570 (1952); Moyers v State, 61 Ga App 324, 6 SE 2d 438, 442 (1939); Wharton, Criminal Evidence, 12th ed, § 285, page 659. Although Professor Wigmore contends that such evidence should be admissible for whatever it is worth, he concedes that such conduct is often feigned and artificial. Wigmore, Evidence, 3d ed, § 293. While we do not regard it as error to admit evidence

**744**

of this sort, which may be viewed as tending to show a consciousness of innocence, we cannot agree that the special instruction requested in this case should have been given. Frequently persons who commit crimes of this nature surrender because they are actuated by feelings of guilt and remorse. As a matter worth noting, there were factors in this case which offset the claim that accused's conduct indicated belief in his own innocence. How much his seeing a notice that he was wanted as a fugitive, or how much his consultation with the Chaplain influenced his return, we do not know, but we are certain that if one of these factors was to be the subject of an instruction, the instruction would be sound only if all of these possible explanations were mentioned. Furthermore, even an adequate instruction on conduct possibly indicating a consciousness of innocence would not give a complete picture unless accompanied by an instruction on the evidence of flight, a circumstance tending to indicate consciousness of guilt. Carried to its logical conclusion, such an enlargement of the instructions would only confuse the court-martial members and divert their attention from the real issues of the case. Accordingly, this assignment of error is overruled.

The final error argued by appellate defense counsel is that the admission into evidence of photographs showing the wounds on the victim's body were of an inflammatory nature and had no relevant connection with the question of guilt or innocence. However, the record reveals that these exhibits were referred to extensively by the medical officer, who examined the body shortly after the homicide, when he testified as to the cause of death. In addition, they cast light on the question of whether the accused used more force than was necessary to repel the alleged attack. Whether they were or were not inflammatory is not the matter of importance. They served a legitimate purpose and that renders them admissible.

A claim of error similar to this was dealt with at length by this Court in

United States v Bartholomew, 1 US CMA 307, 3 CMR 41. We there noted, at page 314:

". . . It is well established that a photograph may be admitted in evidence for the purpose of identifying a person, even though it possesses a shocking aspect which might conceivably tend to excite the passion of the jury. Wilson v. United States, 162 US 613, 40 L ed 1090, 16 S Ct 895; Wharton, Criminal Evidence, 11th ed, 1935, page 1321. . . . The photographs of the deceased soldier were admissible to prove the exact nature of his wounds and the manner of death. People v. Smith, 15 Cal 2d 640, 104 P2d 510; Commonwealth v. Dreamer, 324 Pa. 220, 188 A 177. Here there were several wounds which were discussed at length by various prosecution witnesses, including a medical expert. The photographs served to provide assistance in explaining and illustrating this testimony and enabling the court-martial to determine the cause of death."

In addition to the ground of relevancy, we are certain there is no reason for apprehending that the photographs so affected the passions of the court members that the exhibits were not considered in their proper perspective. We do not view them as of such a nature as to be likely to be unduly inflammatory. Accordingly, the admission into evidence of the photographs under attack was quite proper.

Several other assignments of error were briefed by appellate defense counsel. We have examined them, together with other possible grounds of error, and have concluded that there are no remaining issues which justify separate treatment. In addition, we have determined that the record shows the conviction was obtained without any denial of a substantial statutory or constitutional right. Such being the case, further discussion is unwarranted.

The decision of the board of review is affirmed.

Chief Judge QUINN concurs.