UNITED STATES, Appellee

v

LESTER H. EVANS, Staff Sergeant, U. S. Marine Corps, Appellant

17 USCMA 238, 38 CMR 36

No. 20,077

September 15, 1967

*Lieutenant J. Arthur Bruno*, USNR, argued the cause for Appellant, Accused.

*Captain Francis T. Coleman*, USMCR, argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas P. Casey*, USMC, and *Lieutenant Colonel C. R. Larouche*, USMC.

Opinion of the Court

FERGUSON, Judge:

A general court-martial convened at DaNang, Republic of Vietnam, by the Commanding General, Third Marine Division, convicted the accused of unpremeditated murder and sentenced him

**239**

to dishonorable discharge, forfeiture of all pay and allowances, confinement at hard labor for seven years, and reduction. Intermediate appellate authorities affirmed, and we granted accused's petition for review on the question whether the law officer erred in failing to instruct the court, as requested, on the lesser included offense of involuntary manslaughter and, *sua sponte*, on the law regarding justifiable homicide during the course of a lawful apprehension.

## I

In early June 1966, the curtain rose on the tragic events depicted in this record. The victim, Private First Class Bashaw, had arrievd in Vietnam shortly before his death. Publicly claiming to be a drug addict, he was referred to the battalion surgeon for treatment, and sent elsewhere for psychiatric consultation. He was found to be suffering acute anxiety, but, with the prescription of tranquilizing drugs, was returned to duty. Apparently, he shortly thereafter absented himself without authority under combat conditions.

On June 7, 1966, accused, who was acting as his unit's gunnery sergeant, was ordered by his company commander to apprehend Bashaw, who, by then, had been absent for about four days. Evans was not acquainted with Bashaw but knew "this man was armed with an automatic M-14" and "he had already locked and loaded on one man that had attempted or was going to attempt to bring the man in."[1]

Evans, armed with a shotgun and accompanied by Corporal Wildt, Private First Class Conner, and Lance Corporal Sackett, set out to find Bashaw and apprehend him. Traveling by a vehicle known as a "mighty mite," they proceeded to the vicinity of a bridge near which Vietnamese troops were stationed. Searching some bunkers there, they found Bashaw's uniform, helmet, and cartridge belt. Although they were unable to obtain any information from the Vietnamese troops concerning his whereabouts, a child informed them a Marine was in or near a village located down the road. The patrol proceeded in that direction.

As they drove, Corporal Wildt observed an individual walking along the road, dressed in Vietnamese military fashion. The vehicle stopped, and accused dismounted. He asked the individual his name and, on receiving the reply, "Bashaw," covered him with his shotgun and disarmed him. As to what occurred thereafter, the parties are in disagreement.

According to the prosecution witnesses, Evans swung his shotgun barrel at Bashaw. As he did so, the weapon fired, and the charge passed over the deceased's right shoulder. Bashaw began to back away, and Evans, after operating the loading mechanism to place another shell in the chamber,[2] shot him in the upper chest at a range of approximately three feet. Bashaw fell on his back, muttering that he was sorry. Accused is then stated to have struck him in the face with the shotgun butt, shouting imprecations against deserters and that he deserved to die. Corporal Wildt told him Bashaw was dead, and there was no need to continue striking him. Accused desisted and ordered his men to allow the body to lie on the ground and bleed, as there was no use in getting blood all over the vehicle. Subsequently, Bashaw's body was loaded on the "mighty mite" and the party returned to their

---

[1] In the pretrial investigation, a Private First Class Parker testified that, earlier on June 7, he had encountered Bashaw on a dirt road near the battalion command post. He was dressed in Vietnamese military attire and armed with an automatic weapon. Bashaw looked "like an ARVN or a hard core VC." When Parker placed his hand on the butt of his pistol, intending to draw it "and try and bring him in," Bashaw operated his rifle bolt and "put a round in the chamber." Parker desisted in his efforts to apprehend Bashaw and returned to his unit. The incident was reported to the company office. Unaccountably, this testimony was not presented at the trial.

[2] The weapon was a hammerless, pump-action repeating shotgun.

unit. *En route,* Evans stopped at the bridge, displayed the body to the Vietnamese soldiers, questioned their lying to him concerning Bashaw's whereabouts, and threatened their leader with death if he was there the following day.

Bashaw was pronounced dead by the battalion surgeon. An examination of his pockets disclosed the presence of a hypodermic syringe, needles, and a number of tranquilizer capsules.

Accused elected to testify in his own behalf. His recounting of the events which led up to the discovery of Bashaw's identity closely paralleled that of the other witnesses. Thereafter, he differs materially as to what occurred. According to Evans, he disarmed Bashaw, handed the latter's rifle to another member of the patrol, and, turning back to the deceased, informed him that he was under arrest. Bashaw suddenly "threw his hand up and knocked my shotgun up and to his right, causing one round to go off, sir." Evans "grabbed the weapon with both hands and I came back and threw a slash at the man's shoulder trying to knock him off balance so I could apprehend him, sir." The "next thing that I remember was the man laying on the ground, he was laying on his side and he had a hole in his chest, sir." Accused could not recall striking or saying anything to Bashaw as he lay on the ground. He told the other Marines to " 'Let him lay there for a minute.' " The "mighty mite" was turned around, Bashaw's body loaded in it, and the patrol started on its return to base. *En route,* accused stopped at the bridge to tell the Vietnamese he would return with an interpreter on the following day to see why they had lied to him.

Accused, a veteran of thirteen years' spotless service, conceded he had no use for Marines "who don't do their job" and that "they have no place in the Marine Corps." However, he did not shoot Bashaw for that reason. He took no personal action with respect to deserters, for "it is the Marine Corps place to get rid of these people." He agreed he had, in fact, shot Bashaw, but "Not intentionally, sir, no." On cross-examination, he reiterated that he struck at Bashaw with the shotgun, "thinking I would knock the man off balance so I could apprehend him. The next thing I knew the man was laying on the deck." Although he could not recall the details of what transpired in that instant, accused declared he suffered from no failure of memory, "it's just that everything happened so fast that I don't know what all happened, sir."

Corporal Wildt, testifying as a prosecution witness, agreed he saw Bashaw, before any shots were fired, "either trying to defend himself or trying to take the weapon away" from Sergeant Evans. After the first shot was fired in the air, the deceased "continued to struggle or try to grab hold of the weapon." Private First Class Conner, "really couldn't say" if this were the case, while Lance Corporal Sackett declared that Bashaw "was either grabbing the shotgun or trying to block it," but only after Evans attempted to strike him with it. Before Evans did so, Bashaw "was standing there with his hands down to his sides, sir."

Extensive evidence was introduced as to accused's fine character as a Marine and family man; as a truthful individual; and as one whose peaceable nature did not allow him to resort to violence.

## II

On the foregoing evidence, the law officer determined no lesser included offenses other than unpremeditated murder were in issue and refused to instruct on the elements of involuntary manslaughter. He likewise limited his advice regarding justifiable homicide to a bare definition of the term, mentioning as one of several examples thereof "killing a person who is resisting arrest or apprehension if no other reasonable apparent means are adequate." The staff legal officer and the board of review, after extensively considering the evidence, likewise found no other lesser offense placed in issue. The Government here asserts the same conclusion, declaring there is no authority for the proposition that an ac-

cused's unsupported testimony may give rise to such an issue for the fact finders. With this contention, we unreservedly disagree, and are of the view that both justifiable homicide and the lesser included offense of involuntary manslaughter were placed in issue by the evidence and instructions thereon required to be delivered to the court-martial.

Preliminarily, we note it is an entirely human tendency to listen to the presentation of evidence or to read a record of trial, accept certain testimony and reject other, arrive at factual conclusions, and proceed thereafter to make decisions of law based upon such preconceived notions. It is entirely human to do so, but as regards the raising of issues, so to act is not the function of this Court, the board of review, the convening authority, or the law officer. In this respect, Congress has confided the fact-finding power exclusively to the members of the court-martial. It is for them, not for the law officer or an appellate body to sift the evidence and determine whether it chooses to believe an apparently overwhelming case presented by the United States or the single, unsupported word of the accused. To make this choice, it must be properly instructed, and, when the law officer or appellate bodies, understandably or not, invade the province of the fact finders, and deny instruction on that basis, reversal will inevitably come. The Government will be put to the time, expense, and difficulties incident to another trial; the accused will have to undergo another hearing at which his contentions will finally be submitted; and all this will occur because of a failure to trust to the judgment of those solely charged with the responsibility of finding the facts and giving credibility where credibility is due.

Thus, we have long held the test whether an offense is reasonably raised is whether the record con- ▓ tains some evidence to which the military jury may attach credit if it so desires. United States v Jones, 13 USCMA 635, 33 CMR 167; United States v Remele, 13 USCMA 617, 33 CMR 149; United States v Kuefler, 14 USCMA 136, 33 CMR 348. It matters not that the accused is the sole source of his contention. He certainly, "has the capacity to testify directly to the intent, knowledge, or other *mens rea* which fills out and characterizes his acts either as criminal or legally blameless." United States v Remele, supra, at page 621. And the reasonable character of his testimony is "for the determination of the court-martial, under proper instructions." United States v Jones, supra, at page 640. As we said in United States v Kuefler, supra, at page 139:

"So also do trial judges and appellate bodies interfere with the function of the court members and deprive the accused of his right to a primary trial on the facts when the credibility of his claims is found wanting in light of the strong case against him."

Hence, without thought of reprimand and in the interests of the sound administration of justice, we strongly recommend in all cases a close examination below of the evidence presented, submitting all conflicts therein to the court-martial with proper instructions on the elements of lesser crimes and affirmative defenses thereby raised. Needless reversals will thereby be avoided, and the accused will receive his proper day in court, with justice under our system being done to all concerned.

Turning to the case before us, it is true, as the Government urges, that its case, if believed by the ▓ court, paints a picture of the wanton slaying of a hapless, unarmed prisoner, by an enraged noncommissioned officer charged by law with apprehending him and delivering him to the bar of justice. It matters not that Bashaw had committed a most serious offense by leaving his comrades under fire or was wearing a uniform as if he were a "Viet Cong hard core." No one has the right to summary execution, regardless of the offense or provocation. But there is in the record another version of the events, and, as we have

noted, credibility of the evidence is not the test for instructional sufficiency. United States v Kuefler, supra.

Thus, according to the accused, he did not intentionally kill Bashaw. All agree that the gun was unintentionally discharged once into the air. The accused avers that this occurred when Bashaw, resisting lawful apprehension, attempted to seize his weapon. Thereafter, he brought its barrel back down in an attempt to knock the man off balance and subdue him. Though events transpired so rapidly that he could not recall the details, it is apparent that, in doing so, the weapon mechanism might have been activated and fired into the deceased's upper chest.

Accused's testimony further makes clear that Bashaw was an armed individual, who had, to accused's knowledge, resisted prior apprehension by "lock[ing] and load[ing]" his automatic rifle on another Marine. His discarded uniform and assumption of garb known to have been worn by the enemy, as well as the Vietnamese Army, colors his resolve not to be returned to duty and, when—according to accused's testimony—he attempted to disarm his captor, clearly raised an issue as to whether the subsequent homicide was justifiable as having been committed by an apprehending officer in the necessary execution of his duties.

The doctrine has been well stated in Warren on Homicide, Perm ed, § 145, at page 623:

"Where persons having authority to arrest or imprison, or otherwise to execute the public justice, and using the proper means for that purpose, are resisted in so doing, and the party resisting is killed in the struggle, such homicide is justifiable. . . . But although a peace officer in the discharge of his duty is protected while acting as an officer and within the law, he can not take the life of a citizen unless necessity therefor exists.

. . . . .

" . . . The general rule is that one authorized to make an arrest can use such force as reasonably appears to be necessary, but he must be careful not to exceed the necessity of the case."

In United States v Clark, 31 Fed 710 (ED Mich) (1887), the defendant, acting as sergeant of the guard, shot and killed a prisoner escaping from the guardhouse, it appearing that there was little or no chance of overtaking him before he gained his freedom. Upon his trial before the Federal Circuit Court, he was discharged, Judge Brown noting, at page 713:

"The general rule is well settled, by elementary writers upon criminal law, that an officer having custody of a person charged with felony may take his life, if it becomes . . . necessary to do so to prevent his escape. . . ."

So also, in Holland v State, 162 Ala 5, 50 So 215 (1909), it was held prejudicial error to refuse an instruction that resistance to a legal warrant might consist of acts or demonstrations by the person to be arrested, importing defiance and indicating an immediate purpose to use violence, and that after such acts or demonstrations, the officer might at once employ such force as was necessary to accomplish the arrest, even to the taking of life. See, to like effect, Giles v Commonwealth, 266 Ky 475, 99 SW2d 455 (1936), wherein it is stated that police, having arrested a citizen, are entitled to use such force as was necessary, or appeared at the time in exercise of reasonable judgment to be necessary, to overcome the forcible resistance of their prisoner, even to taking his life. The same principles are supported by the authorities collected in Wharton, The Law of Homicide, 3d ed, § 487, et seq., and 26 Am Jur, Homicide, § 230, et seq.

In the case before us, accused by his testimony made it clear that his aggressive actions toward Bashaw, culminating in the latter's death, were undertaken as the direct consequence of Bashaw's attempt to seize the shotgun. Accused had been informed that Bashaw was armed and apparently determined to avoid apprehension.

Evans was lawfully clothed with authority to apprehend Bashaw for his alleged desertion both by reason of his company commander's orders and by reason of his grade as a noncommissioned officer. See Code, supra, Article 7, 10 USC § 807, and Marine Corps Manual, paragraph 1630.3. True, the court-martial was not bound to accept his testimony, but he was entitled to have it considered under proper instructions, which submitted the issue of justifiable homicide by an officer of the law whose lawful authority to apprehend for a suspected felony was met with resistance. This was the very core of the defense and, under the circumstances, it was plain error for the law officer not to advise the court-martial appropriately.

### III

In like manner, we hold it prejudicially erroneous for the law officer to have rejected the requested ■ ■ instructions on the lesser offense of involuntary manslaughter. Even assuming the accused was not justified in killing Bashaw, the fact remains that he expressly denied he intended to do so. Contrary to the Government's assertion, the evidence likewise left it clearly open to the court-martial to infer that he also did not intend to inflict grievous bodily harm upon the victim. The situation, therefore, is precisely similar to those before us in United States v Taylor, 16 USCMA 489, 37 CMR 109, and United States v Moore, 16 USCMA 375, 36 CMR 531. In the former case, the accused testified that the stabbing of the victim occurred during an attempt to break up an affray and denied any intent to kill or inflict grievous bodily harm upon his victim. In the latter, the accused averred that he shot near the victim in an attempt to prevent his departure and denied any intent to hit him. In both, we found involuntary manslaughter, in violation of Code, supra, Article 119(b), 10 USC § 919, placed in issue by the denial of intent necessary to murder. In both, we emphasized the question of that intent was peculiarly one for the fact finders. The same principle is applicable here,

and we reiterate the declaration of the Supreme Court in Morissette v United States, 342 US 246, 96 L ed 288, 72 S Ct 240 (1952), at page 274:

"Where intent of the accused is an ingredient of the crime charged, its existence is a question of fact which must be submitted to the jury."

The findings of guilty and the sentence are set aside. The decision of the board of review is reversed and the record of trial is returned to the Judge Advocate General of the Navy. A rehearing may be ordered.

Judge KILDAY concurs.

QUINN, Chief Judge (dissenting):

The majority hold that in two particulars the law officer's instructions are fatally deficient: First, because he failed to instruct fully on justifiable homicide; and, second, because he declined to instruct on the lesser offense of involuntary manslaughter. I disagree with both conclusions, for I find neither supported by the record of trial.

No one will seriously challenge the right of an individual charged with the duty of apprehending suspected felons to use all reasonable force to accomplish his mission. But killing is a last resort, not a first thought, and is justified only by necessity. Warren on Homicide, Perm ed, § 145. The essential element of *necessity* is completely lacking in the circumstances of this case.

Nothing in the testimony of the five eyewitnesses suggests the presence of necessity. The testimony of the accused, relied on as the source of the theory, fails to raise it. The accused asserted that after relieving Bashaw of his weapon and placing him under apprehension, he held him at bay at the point of his shotgun. This is how he described the tragedy:

"... At this time, the man threw his hand up and knocked my shotgun up and to his right, causing one round to go off, sir.

. . . . . . .

"When he hit the shotgun it went

244

off in the air and I grabbed the weapon with both hands and I came back and threw a slash at the man's shoulder trying to knock him off balance so I could apprehend him, sir.

. . . . .

" . . . [T]he next thing that I remember was the man laying on the ground, he was laying on his side and he had a hole in his chest, sir.

. . . . .

"I don't remember doing nothing at all to the man, sir."

With the foregoing as his basis, the defense counsel advanced the following argument on justification:

" . . . Let us consider some of the circumstances that go into the decision of the action taken by Staff Sergeant EVANS. Let us consider how appropriately he was acting under these circumstances. It is a well known fact by now that Staff Sergeant EVANS was a drill instructor for over a three year period, that during this time, he had extensive training in hand to hand combat and bayonet fighting. He testified to you from his own mouth that in order to be an instructor in this field you were supposed to learn all the movements automatically so that they may become instinctive, so that he can react without thinking. In this particular situation in the apprehension of BASHAW, Sergeant EVANS was not premeditating that second shot, he was acting automatically as he had been trained, instinctively. His testimony of not remembering is really consistent with the training that he had received previously."

Neither the testimony of the accused nor the argument of his counsel suggests any necessity for the killing. The approach of the defense was simply: Whenever the slightest resistance is shown, a trained Marine is justified in meeting it "automatically" and "instinctively" with lethal force. The fallacy of that position is established by the authorities relied on by the majority.

The remainder of the circumstances do not provide the element of necessity. While the majority put much emphasis on the report that the victim had "locked and loaded" on a would-be captor earlier in the day, the fact is he meekly surrendered his weapon to the accused without attempting to use it. Again, the majority suggest the victim was a drug addict, a condition which made him even more dangerous. However, the battalion surgeon, who examined the victim shortly before the fatal day, found him simply a "very immature, nervous individual, [with] gross feelings of inadequacy" and, in the doctor's opinion, "basically whether or not he was actually a drug addict, his publicizing this fact was a means of getting attention as a part of his general insecurity." Physically, the victim was five feet, eight inches tall, and weighed one hundred forty-two pounds. He was eighteen years old and had been in the service one year. The accused, on the other hand, stood over six feet in height, and weighed more than two hundred pounds. He was thirty-one years old, with thirteen years of service behind him. His combat experience and his expertise in hand-to-hand fighting were well established. If one of the size, experience, and ability of the accused could not subdue an immature, undersized, unarmed youth, there were three other armed Marines in the apprehension team ready to assist him, without resort to killing. Assuming, therefore, that the law officer's instructions on justification were inadequate, prejudice could not result. United States v Amdahl, 3 USCMA 199, 11 CMR 199.

In the absence of justification, the mere denial of an intent to kill or inflict grievous bodily harm does not suffice to raise involuntary manslaughter. Here, as in United States v Snyder, 6 USCMA 692, 21 CMR 14, and United States v Jones, 10 USCMA 122, 27 CMR 196, unjustified lethal force was used against the victim, and the uncontradicted evidence of the circumstances is such as to establish a

positive intent to inflict, at the very least, grievous bodily harm.

The accused's denial of an intent to kill or inflict grievous bodily harm must be viewed in the light of all of the circumstances, and when this is done its futile nature is disclosed. If the victim touched the shotgun at all, he did so only to turn its muzzle away from him. There was no attempt to wrest the weapon from the accused before either of the two shots were fired. Nor was the victim making any attempt to flee. Although the accused professed no recollection of the events, it is undisputed that when the victim, fatally wounded, audibly sought to make his peace with his Maker, he mocked him with the current comedy quip "'sorry about that.'" With this taunt still echoing, he then brought the butt of his weapon down repeatedly upon the head of the helpless figure, uttering indescribable profanities, interspersed with declarations that "'You're a deserter, you don't deserve to live.'" He stopped only when others intervened, and informed him his quarry had expired. The physical facts fully corroborate the testimony of the five eyewitnesses, for the certificate of death notes lacerations to the forehead area. Their full extent, unfortunately, was never determined because an autopsy was deemed unnecessary in light of the gaping chest wound, which was the obvious cause of death. Equally obvious is the inference compelled by the accused's acts and words following the fatal shot. United States v Amdahl, supra; Burnaman v State, 70 Tex Crim 361, 159 SW 244 (1913).

Both United States v Taylor, 16 USCMA 489, 37 CMR 109, and United States v Moore, 16 USCMA 375, 36 CMR 531, relied upon by the majority, are inapposite. In the *Taylor* case, the accused professed he had no intent to kill or injure his victim and asserted he was unaware he had a knife. In *Moore,* the accused admitted using a weapon, but declared he intentionally fired ahead of the victim to stop him, not to harm him. In the instant case, a deadly force was used directly upon the person of the victim and in such a way that only death could have resulted.

I would affirm the decision of the board of review.