UNITED STATES, Appellee

v

MICHAEL R. WALKER, Private First Class,
U. S. Army, Appellant

20 USCMA 241, 43 CMR 81

No. 22,810

January 8, 1971

*Scott E. Jarvis, Esquire,* argued the cause for Appellant, Accused. With him on the brief were *Captain Libero Marinelli, Jr.,* and *Captain Frank B. Stahl, Jr.*

*Captain Mark Rosenberg* argued the cause for Appellee, United States. With him on the brief were *Colonel David T. Bryant* and *Major Edwin P. Wasinger.*

## Opinion of the Court

QUINN, Chief Judge:

On the night of January 20, 1968, the accused shot and killed his "best friend," Private First Class James F. Wright. A general court-martial convened in the Republic of Vietnam found him guilty of premeditated murder. The findings of guilty were reduced to unpremeditated murder by the United States Army Court of Military Review. In this Court the accused contends the evidence is not sufficient to support a finding that he "was legally sane" at the time of the offense.

No medical testimony as to the accused's mental condition at the time of the offense appears in the record. The bulk of the Government's case consisted of evidence regarding the circumstances of the homicide and the accused's ap-prehension. However, various lay witnesses testified to peculiarities of conduct by the accused. Properly, the account begins not with the commission of the offense on January 20, 1968, but with the accused's arrival in Vietnam in October 1967.

The accused came to Vietnam as a rifleman. He was assigned to a unit that engaged directly in combat with enemy forces. In encounters with the enemy, the accused was "pretty scared," but his fear did not diminish his performance. No one ever "had any trouble" with him.

Increasingly, in the course of his activities, the accused realized that he "really needed God" to keep his soul from "going to hell." His father and mother had been preachers, and he cus-

**242**

tomarily carried a copy of the New Testament. He began to pray frequently to help himself "grow stronger in His name." Company personnel generally believed the accused was "very religious." While the accused "kept pretty much to himself," he was described as a "pretty nice guy"; and he had at least two good friends, Privates First Class William Dolphin and James F. Wright, the man he killed.

On December 18, the company was "in the field." As a part of the company prepared for a reconnaissance force patrol, others, including the accused, secured the perimeter of the encampment. Suddenly, the accused started "acting up." According to the accused, he sat down, and, without knowing "why," began to talk to the Lord; he had no recollection of the incident.

Witnesses testified that the accused screamed and yelled, and that he made such statements as "'Oh Lord, Oh Lord, my Lord has saved me,'" that his soul had been saved, and that he had "the spirit." The accused clapped his hands, jumped around, and made "all sorts of noise." To Dolphin, it "seemed like he was mixed up." Several persons tried to talk to the accused, but got no response. Medical personnel took control, and, after about ten minutes, the accused seemed "normal," but his speech remained "sorta fuzzy." On previous occasions, the accused had heard "spirts," but this was the "first time" God had talked directly to him.

After this incident, the accused was examined by the Division Psychiatrist. The record does not indicate what psychiatric evaluation, if any, was made, but when the accused returned to the company he was, as Lieutenant John A. Meads, III, testified, "put on no field duty by orders of the Company Commander."

As a result of his December 18th experience, the accused believed that God had "showed . . . [him] the way." He wrote to his mother about it, and to confirm his commitment to God gave up the consumption of alcoholic beverages and the telling of "white lie[s]" and jokes, all of which

he regarded as sins. But, he "started drifting back." "Once" he seemed to reexperience the "same feeling" he had had on December 18, but "it just wouldn't come." He felt he was not really "ready for the tests and trials" of God. To others, he appeared to be normal. Witnesses testified that in the interval between December 18 and January 20, he acted "[l]ike a regular person"; he was "[l]ike himself," that is, the "quiet type of guy," the "pretty nice guy."

About 5:00 p.m., on January 20, the accused went off duty. He went to dinner; spent some time in the company area; then went to the enlisted men's club. Wright, Dolphin, and others also went to the club. Dolphin saw the accused at a table; he approached and asked: "'What's happen' man?'" Oddly, he was not asked what, or whether, the accused replied. Dolphin did, however, testify that the accused "had a few beers." The testimony then shifts to the barracks and to a time about two and one-half hours later.

Several persons were playing cards in the barracks at about 9:30 or 10:00 p.m. The accused entered. His condition was described as "sort of strange." He seemed "excited," and unlike his "usual self"; he was "sweating." The accused approached Dolphin. Two witnesses, Dolphin and Private First Class Gene E. Steiner, testified to what transpired. The pertinent parts of their testimony are as follows:

### Dolphin

"A. . . . He said 'Dolphin, we're going to have a duel'. I said 'This doesn't even make sense, you're actin' like a child, man, talking about a duel.' First I asked him if he was serious and he said 'yes' and I said 'You're actin' like a child'. Then afterwhile he must have got mad because he left right there when I said he was acting like a child. Then he went out and came back with a weapon. [About three to five minutes later.]

**243**

"Q. Then did he threaten you?

"A. Yes.

"Q. Did he point the weapon at you?

"A. Yes.

"Q. Did you try and talk to him?

"A. I tried to talk to him but I couldn't talk to him. He put the weapon down and my weapon was over in the corner and he said 'Dolphin, I'll give you a chance to go for your weapon' and I says 'Man, you're clownin' around, aren't ya?' so then he said 'No, go on, man'. I looked over that way and all my friends were there too.

"Q. Did you try and talk him out of this duel?

"A. Yes.

"Q. Did he seem to understand what you were saying?

"A. No."

*Steiner*

"Q. Would you say that certain people that were in the barracks were trying to calm down Walker, is that right?

"A. They were trying to go over there and get the weapon from him. Trying to keep him from shooting Dolphin and allow him to get out the door.

"Q. What was his condition at the time?

"A. I don't know if he had been drinking or not. He was awful upset.

"Q. Was he excited?

"A. Yes, sir.

"Q. Was he yelling?

"A. Yes, sir.

. . . . .

"Q. Who else tried to calm him down?

"A. There was Julia, Mobley.

"Q. And what was the results of their efforts?

"A. They failed. They couldn't get the weapon from him. When Mobley failed, Julia went out there. No one could seem to calm him down enough, sir. No one could get the weapon from him.

"Q. How well do you know and how long have you known PFC Walker?

"A. I've known him approximately two weeks before that. I knew him because he was a ¾ driver.

"Q. Have you ever seen him excited like this before?

"A. No, sir."

Out in the company area, the accused apparently fired a burst from his rifle. Steiner called to Wright to "come back," but Wright "wouldn't listen." Wright and the accused were heard "talking back and forth." Sergeant First Class Albert L. Sisco, who had been awakened from sleep by the first shots, got up to investigate. He was outside his building about fifty meters from the accused. He thought the accused's speech was "more or less incoherent." He determined that the accused was telling Wright that "he didn't want to hurt him," but generally the accused's speech did not make "any sense just hearing it." According to Lieutenant Meads, who had also been awakened by the gun fire, the accused's voice was "very loud and excited"; he could not make out the "exact words" of the conversation between the accused and Wright, but he heard Wright say: " 'I don't know why you want to do this, I'm your best friend' " and the accused replied with "something to the effect that he was intending to shoot" another person.

Sergeant Sisco called to the accused to put down his weapon and come over to him, but the accused did not respond. Another soldier near Sisco called out, and "three or four rounds" came in their direction. "[A] few minutes later" more rounds "went off." Steiner heard the accused call Wright's name, but there was no answer. Hearing this last burst, Lieutenant Meads, who was now at the orderly room awaiting the arrival of the military police, started back toward the area of the shots. The accused approached him. He said: " 'I've killed a man, I know I've done wrong. I'm ready, take me.' " Meads took the accused by the arm to lead him toward the orderly room,

when, suddenly, the accused jumped atop some sandbags, "started yelling and screaming that he killed a man, it was wrong that he wanted to die and asking the M.P.'s to shoot him because he had done wrong."

A military policeman described the accused as "[v]iolent." He testified he had to handcuff the accused and "put him on the floor." Still, the accused continued to struggle and scream, "God I killed a man, kill me." When placed in the military police jeep, the accused kicked out the windows; at the military police station, he continued to scream and kick to such an extent that his legs were chained and he was put into a "CONEX" (confinement box) still "yelling and screaming." He was left handcuffed. The next morning, the accused was calm, "like there was nothing wrong."

Wright died of gunshot wounds. He had seven wounds, two of which had penetrated his chest and caused his death. The accused explained Wright's death as a "test that . . . [he] had to go through," but which he failed because he "wasn't strong enough." He testified . that he recalled meeting Wright at the club, but he could not remember anything else about his activities until he woke "up in the CONEX."

The last item of evidence bearing on the accused's state of mind was a stipulation as to expected testimony by the Division psychiatrist. The stipulation was offered in rebuttal by the prosecution. It provides as follows:

"If Colonel Pettera, the Division Psychiatrist, were present to testify he would state that he examined the accused, PFC Walker, on 26 January. That as of 26 January, he found that the accused was sane, that is as of 26 January he could distinguish right from wrong and he could adhere to the right. However, the Colonel would further testify—the psychiatrist would further testify that he could not state whether as of 20 January, PFC Walker was sane or was insane, that is whether as of 20 Jan-uary, he could distinguish right from wrong or could adhere to the right."

To exclude intoxication as a possible explanation for the accused's conduct, defense counsel asked the arresting military policeman whether the accused had been "apparently intoxicated." The witness replied that he "couldn't tell." As noted earlier, Dolphin testified that the accused "had a few beers." The accused himself testified that he was not "a heavy drinker," and when he drank he had maybe "a couple of cans" of beer. Trial counsel suggested to the law officer that this evidence raised an issue as to the effect of intoxication, but the law officer ruled that it was insufficient to "bring up intoxication" as an issue. No instructions on the subject were given.

In a criminal case, the Government may proceed initially on the assumption that the accused is legally sane. However, the introduction of evidence of a lack of mental capacity imposes upon it the burden of establishing beyond a reasonable doubt that the accused possessed the mental capacity to distinguish between right and wrong and to adhere to the right. United States v Biesak, 3 USCMA 714, 14 CMR 132 (1954); United States v Lewis, 14 USCMA 79, 33 CMR 291 (1963). Appellate defense counsel contend that the Government failed to meet that burden.

Depending upon its nature, evidence casting doubt upon the accused's sanity at the time of the offense may serve two functions. First, it may require appropriate instructions to the court members to guide them in determining the accused's mental capacity; secondly, it may be sufficient to leave the triers of the facts with a reasonable doubt as to the accused's sanity. Evidence sufficient for the first purpose is not necessarily sufficient for the second, since other evidence opposed to that raising the issue of sanity may convince the fact finders beyond a reasonable doubt that the accused was sane when he committed the offense charged. United States v Carey, 11 USCMA 443,

29 CMR 259 (1960). Resolution of a conflict in the evidence as to sanity is not different from resolution of other conflicts; all such conflicts are within the province of the fact finders. United States v Oakley, 11 USCMA 187, 29 CMR 3 (1960). The frame of reference for our consideration of the sufficiency of the evidence has, however, been materially altered by a factual determination made by the Court of Military Review.

Reevaluating the evidence, as it had the right to do under Article 66, Uniform Code of Military Justice, 10 USC § 866, the Court of Military Review overturned the court-martial's finding of total mental responsibility to hold that it was not convinced beyond a reasonable doubt that the accused was "mentally capable of entertaining the premeditated design to kill." We start, therefore, with a finding that the accused lacked a significant degree of cognition and control. That finding compels consideration of the evidence from the standpoint of whether it is susceptible of being compartmentalized as it was by the Court of Military Review. A factual determination must be "rationally consistent with the evidence, measured by the required degree of proof." Douglas v United States, 239 F2d 52, 59 (CA DC Cir) (1956); see also United States v Carey, supra.

Certainly, there is evidence of cognitive ability and control on the part of the accused, as indicated by his recognition of persons, his orientation to place, and his handling of his weapon. Yet, the Court of Military Review determined that this evidence was insufficient to convince it, as fact finder, of the accused's mental ability to premeditate. Since it found the evidence deficient as to this element of the offense, its other finding that the evidence also proved beyond a reasonable doubt the larger matter of the accused's mental capacity to comprehend the nature and quality of his act suggests that it dissected the evidence with virtually surgical precision. The substantial reduction in sentence that resulted

**246**

from the court's action has undoubtedly benefited the accused, but that leaves untouched the question whether the record admits of the sort of abiding conviction of correctness that justifies final approval.

Military law accords insanity a "preferred status." United States v Babbidge, 18 USCMA 327, 329, 40 CMR 39 (1969). That principle and the procedures to effectuate it are designed to assure as complete a factual basis as possible for determination of the accused's mental capacity for the crime charged. Further inquiry into the accused's mental condition is encouraged whenever it appears from the record that such inquiry is warranted "in the interest of justice," regardless of whether the question of sanity has been raised before, and determined by, the fact finders. Manual for Courts-Martial, United States, 1969 (Revised edition), paragraph 124. Of course, great difficulties are involved in "retrospectively determining" the accused's mental capacity. Dusky v United States, 362 US 402, 403, 4 L Ed 2d 824, 80 S Ct 788 (1960); United States v Jacks, 8 USCMA 574, 577, 25 CMR 78 (1958). But the necessity for the inquiry justifies the attempt, especially in a case such as this, in which account must be taken of the effects of stresses and anxieties generated by duty in a combat zone. The evidence which left the Court of Military Review unconvinced of the accused's mental ability to premeditate argues powerfully for exhaustion of all the resources allowed by law for full development of the factual predicate before judicial pronouncement on the accused's sanity is made. See United States v Koch, 17 USCMA 79, 80, 37 CMR 343 (1967).

We return the record of trial to the Judge Advocate General of the Army for submission to the Court of Military Review so that it may make further inquiry into the accused's sanity under the provisions of chapter XXIV, Manual, supra. See United States v Schick,

6 USCMA 493, 20 CMR 209 (1955), 7 USCMA 419, 22 CMR 209 (1956).

Judge DARDEN concurs.

Judge FERGUSON concurs in the result.