UNITED STATES, Appellee

v

JOHN WAYNE THOMAS, Lance Corporal,
U. S. Marine Corps, Appellant

20 USCMA 249, 43 CMR 89

No. 23,069

January 8, 1971

*Lieutenant George F. McGunnigle, Jr.,* JAGC, USNR, argued the cause for Appellant, Accused. With him on the brief was *Frank J. McGee, Jr., Esquire.*

*Captain John J. Reilly,* USMCR, argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Charles J. Keever,* USMC.

FERGUSON, Judge:

The accused was convicted by general court-martial, convened in Vietnam, of one specification each of premeditated murder and aggravated assault, in violation of Articles 118 and 128, Uniform Code of Military Justice, 10 USC §§ 918 and 928, respectively. His sentence to dishonorable discharge, total forfeitures, and confinement at hard labor for life has remained unchanged, through the process of appellate review, to this level. We granted review on the single issue of whether the military judge erred by failing to instruct on the issue of insanity.

There is no factual issue involved as to the *commission* of the offense, for the accused testified at trial that he threw two live M–26 grenades into the tent where the victims were sleeping. Corporal Wells died and Sergeant Stoner was injured by the resulting explosion. The question presented by the granted issue is whether there is, in this record, some evidence that the accused lacked mental responsibility for his crime. Trial defense counsel's request for an instruction on the issue of insanity was denied by the military judge on the ground that the issue was not raised by the evidence. He limited the court's consideration of the question to "whether he [the accused] had sufficient mental capabilities to entertain, and did in fact entertain the premeditated design to kill involved in the offense of premeditated murder."

The evidence in this case on the question of the mental condition of the accused was presented by the accused's own testimony and that of two psychiatrists who testified as defense witnesses. The accused testified as follows:

"Q [Defense Counsel]. Corporal THOMAS, I direct your attention to the early morning of the 15th of February, would you explain to the court exactly what happened on that morning?

"A. I was on my radio watch in the early part of the morning and Lance Corporal MC INTYRE was sitting, well, he was laying down sleeping on the bench and I was just watching in a scope trying to—I don't know, I was thinking about home; that's mostly what I was thinking about. And a voice came in the back of my head and told me to go over and pick up a grenade and kill WELLS. I walked over, I grabbed the grenade and I walked to to the front of the tent. I pulled the pin and I stood there with the grenade in my right hand. I don't know, it just told me to kill WELLS and my hand started shaking. And all of a sudden I popped out of it and I looked at myself and I didn't know what to think. I thought it was kind of a joke or something, I didn't know. It just seemed real strange to me. I put the pin back in the grenade and I walked back and put the grenade in the box, then I walked back to the radar section. I just—I didn't know what to think about this, it was just strange to me. About a half hour later the same voice came back and told me to pick up—go to the grenade box and pick up tow [sic] grenades. I went there; it told me, go directly to the tent, pull the pins and throw them in the tent in the direction of where WELLS was sleeping. It was just growing stronger, I can't explain it, it just kept getting louder and louder, this voice in my head, until I just lobbed them in. And the minute that they came out of my hands I realized what happened and I made a step into the door trying to figure out where they went. I knew they were going to explode so I turned around and made about two or three steps and they blew up. I ran back inside.

"Q. Corporal THOMAS, would you describe a little bit in detail to the court, the nature of this voice that you're talking about? What did you actually hear this voice say, in the best way that you can describe it?

"A. The voice is not like you're just thinking to yourself like, well,

I'm going to go ahead and do this or that. It seems like it's more stern because it's loud and it just takes over control.

"Q. How long has this voice been with you?

"A. I can't remember how far back, sir.

"Q. When this occurs, when this comes into your head, do you have any control, is there anything you can do to fight what it's telling you unless it stops?

"A. No, sir. There's no—I've always did it all my life. I don't know, the voice has always took control of me all my life, ever since I was little, as far as I can remember back.

"Q. There's nothing you can do to prevent from happening what this voice tells you to do? It's suppose[d] to happen?

"A. No sir. It just pops right out.

"Q. During this period of time when you were walking over and this voice was talking to you, was there any thought in your mind as to owing Corporal WELLS any money?

"A. No, sir. The only thought in my mind at all was just that voice repeating over and over, 'Kill WELLS.'

"Q. Was it your contention to kill WELLS in order to get out of paying him the $800.00?

"A. No, sir. I believe it isn't.

"Q. Going back to the discussion on the card game, you did in fact lose a great deal of money, is that correct?

"A. Yes, sir.

"Q. Were there other people in that card game who had also lost money?

"A. There were other people who played with us who lost money, sir.

"Q. Did you at any time feel that you would not pay back this money?

"A. No, sir.

"Q. Did you at any time form an intent to get rid of WELLS in order to get out of paying this money?

"A. No, sir.

"Q. On the 16th you gave a statement to the investigating officers at CID?

"A. Yes, sir.

"Q. Why did you give this statement to CID?

"A. For one thing, sir, I didn't know what to do. I just—I wanted to get rid of this voice or whatever it was. I wanted to see if they could help me. See if they could tell me why I did it and fix me up.

"Q. You weren't threatened in any way or coerced in any way to do this?

"A. No, sir.

"Q. Did you feel that perhaps anybody was closing in on you; that you were going to be causght [sic]?

"A. No, sir. I didn't.

"Q. You felt that perhaps by turning yourself in you could get rid of this voice?

"A. That's what I hoped. I hoped also that they could tell me what caused this voice or something like this, sir. Just to get help, I don't know, to stop or what.

"Q. You have no idea what the nature of this voice is, do you?

"A. I have no idea, sir.

"Q. Did you have any control over your actions on the night—early morning of the 15th, of throwing these grenades?

"A. No, sir.

"DC: I have no further questions."
On cross-examination, the following appears:

"Q. [Trial Counsel]. Did you know WELLS was in that tent?

"A. Yes, sir.

"Q. While you were in front of the radar scope you heard a voice?

"A. Yes, sir.

"Q. That told you to go and kill WELLS?

"A. Yes, sir.

"Q. Did the voice tell you how to do it?

"A. It told me to pick up two grenades, sir.

"Q. How did the voice know that two grenades were available?

"A. I don't know, sir.

"Q. Didn't you, in fact, only pick up one grenade the first time?

"A. The first time it told me to pick up one grenade, sir, yes, sir.

"Q. Oh, it told you to pick up one grenade the first time?

"A. Yes, sir.

"Q. Do you recognize this chart which has been identified as Prosecution Exhibit 2?

"A. Yes, sir.

"Q. Is the spot marked X–7 the spot where the grenade box is kept?

"A. Yes, sir.

"Q. Is that where you picked up the grenade?

"A. Yes, sir.

"Q. And did you then walk to the entrance way marked 'entrance' here to that tent?

"A. Yes, sir.

"Q. What did the voice tell you then?

"A. It told me to throw the grenades, sir, but it really wasn't as commanding like. It told me to just throw the grenade and it just kept shaking in my hand and I popped out of it.

"Q. The grenade kept shaking in your hand?

"A. My hole [sic] hand was shaking, sir.

"Q. Did this voice every [sic] say to you, 'Self, I want to do this or don't do that'? How does this voice communicate with you?

"A. It just pops up and tells me to do something, sir, and I do it.

"Q. Why did you defy the voice the first time?

"A. I don't know, sir. I popped out of it, sir.

"Q. In other words, you were able to not do what the voice told you to do?

"A. It wasn't me, sir. I just popped out of it. That's how—I just pop out of it. Like if the voice tells me something, well, I'll pop out of it.

"Q. Well, did the voice say, 'Forget that last order'?

"A. No, sir. It didn't.

"Q. So in other words, at this point in time you heard a voice saying, "Pick up one or two grenades and go kill WELLS'? And you went to the entrance way of the tent and the voice did not speak to you again but you did not throw the grenade?

"A. The voice did speak to me when I got to the tent, sir.

"Q. What did it say then?

"A. It told me to throw the grenade, sir, but it really wasn't in that commanding of a voice like the last time, sir.

"Q. But, the voice never told you not to throw the grenade?

"A. I'm not a sombie [sic], sir, I don't know. The voice takes control of me. I'm me but really I'm not.

"Q. Did you throw the grenade then?

"A. The first time? No, sir.

"Q. What did you do after that?

"A. Like I said, I put the pin back in the greande [sic], sir, and I went and put it back in the box. It seemed all weird to me when—I laughed.

"Q. What did you do then?

"A. I went back and I sat in the radar seat, sir.

"Q. And that's the spot on the chart marked X–4?

"A. Yes, sir.

"Q. How long did you sit down at the radar scope?

"A. I don't know, sir. I think maybe about 30 minutes. I don't know, sir.

"Q. Did you at any time awaken MC INTYRE to help you?

"A. No, sir. It just seemed weird.

It didn't seem like I should wake up anybody.

"Q. Did you notice whether or not he was asleep?

"A. I noticed he was asleep before, because he went to sleep, sir, right when he came in.

"Q. Had MC INTYRE been awake would you have followed the voice?

"A. I've always done what the voice told me, sir.

"Q. If he were awake you would have walked, picked up the two grenades, and walked into the tent?

"A. If the voice would have told me, sir, I would have.

"Q. How long have you been hearing these voices?

"A. As long as I can remember, sir.

"Q. When was the last time you were in communication with your voice?

"A. From right now to the last time, sir?

"Q. No. Prior to this incident?

"A. I think I was on leave, sir.

"Q. Four months before? Eight months before?

"A. No. The leave just before I come [sic] over to the Nam, sir. It was just about two months or something like this.

"Q. That was the last time you encountered the voice?

"A. Yes, sir.

"Q. What did the voice tell you to do at that time?

"A. Go outside for a walk. I was watching some TV program I was interested in and it just said, 'Go outside for a walk.'

"Q. So, it's a kind of a thing, you're sitting watching TV program and, 'Self, I think I'll go out for a while.' So, you get up and go out?

"A. It don't say that, sir. It's like a command. It tells me to, it don't ask me to.

"Q. Has the voice ever told you to kill anyone before?

"A. No, sir. This is the first time.

"Q. Have you ever disobeyed the voice before?

"A. I've never, sir.

"Q. Other than the first time on the night in question?

"A. I didn't disobey it then, sir. I popped out of it.

"Q. Now, this voice told you to kill WELLS and to pick up two grenades and do it?

"A. It told me to go to the box and when I got to the box it told me to bend down and pick up two grenades and pull the pins and kill WELLS.

"Q. So, when you threw the grenades over to STONER's rack, towards WELLS' rack you intended to kill WELLS?

"A. That's what the voice said, sir.

"TC: The government has no further questions.

"DC: I have no further questions.

"MEMBER (DAHL): No questions by the court."

A Navy psychiatrist who had examined Thomas, testified that he "was an individual of distinctly immature character structure with distinct infantile traits and with some schizoid traits in addition to the immaturity." With respect to what the accused referred to as the "voice," the witness found his description "a credible one." He accepted "it as a valid description of audio-characterization." With regard to the act of throwing the grenade, he testified:

". . . How far that pushed him, how ineluctable, how inexorable that push was I can't possibly quantitate. I can only describe it as, in my opinion, a distinct force. I can't say that it left him 90 per cent free or that it left him 10 per cent free, it's beyond my cant."

Another Navy psychiatrist diagnosed the accused's mental condition as a personality disorder "primarily related to difficulty controling [sic] impulses." He corroborated the accused's account of the "voice" and conceded that it was possible that the commands given by

the "voice" could have been strong enough that the accused may not have been able to adhere to the right.

We are not concerned, in this case, with determining whether or not the accused was mentally responsible for his act, but, only with the narrow question of whether there was sufficient evidence to raise mental responsibility as an issue to be instructed upon.

The military standard for determining whether insanity has been raised as an issue is set forth in paragraph 122a, Manual for Courts-Martial, United States, 1969 (Revised edition):

". . . The accused is presumed initially to be sane and to have been sane at the time of the alleged offense. This presumption authorizes the court to assume that the accused was and is sane until evidence is presented to the contrary. When, however, *some evidence which could reasonably tend to show that the accused is insane* (120d) or was insane at the time of his alleged offense (120b) is introduced either by the prosecution or by the defense or on behalf of the court, then the sanity of the accused is an essential issue."[1]  [Emphasis supplied.]

Once the issue has been raised, the court must be instructed thereon. The introduction of evidence of a lack of mental capacity imposes upon the Government the burden of establishing beyond a reasonable doubt that the accused possessed the mental capacity to distinguish right from wrong and to adhere to the right. United States v Biesak, 3 USCMA 714, 14 CMR 132 (1954); United States v Lewis, 14 USCMA 79, 33 CMR 291 (1963).

It can hardly be denied that there is in this record "some evidence which could reasonably tend to show that the accused is insane." Paragraph 122a, Manual, supra. The fact that the evi-

dence may have come only from the accused does not deny it standing, for, as stated in Young v United States, 309 F2d 662, 663 (CA DC Cir) (1962):

". . . However implausible, unreliable or incredible only the jury had the right to make the evaluation of . . . [the accused's] testimony."

Cf. United States v Jones, 13 USCMA 635, 640, 33 CMR 167 (1963); United States v Kuefler, 14 USCMA 136, 33 CMR 348 (1963); United States v Evans, 17 USCMA 238, 38 CMR 36 (1967); and United States v Meador, 18 USCMA 91, 39 CMR 91 (1969). Here, there is testimony by the accused that a voice took control of his mind, commanded him to do these acts; that he was powerless to resist; that this voice had been with him during his lifetime; and that he was unable to control his actions. In addition, there was character testimony reflecting that his actions were totally inconsistent with his normal character. Both psychiatrists agreed that the accused suffered from a character disorder; that his ability to adhere to the right was impaired; that his acts were neurotically compelled; and one believed it was possible that he was unable to adhere to the right. The classification of the accused's mental condition, by the psychiatrists, as a "character disorder" does not serve to suppress the issue, for, as this Court stated in United States v Storey, 9 USCMA 162, 167, 25 CMR 424 (1958):

"For this Court, therefore, the question is not one of classification but of effect. We are concerned only with whether credible evidence exists which may properly be considered by the triers of the fact in determining whether an accused lacks the mental capacity to entertain a specific intent or have whatever other state of mind is required for the offense charged. We prud-

---

[1] The standard of "some evidence" in the 1969 Manual represents a considerable departure from the standard in the 1951 Manual, which required "substantial evidence." See Analysis of Contents, Manual for Courts-Martial, United States, 1969, chapter XXIV, Insanity, paragraph 122a.

ently leave the question of classification to the psychiatrists. Accordingly, we hold that it is the evidence presented concerning the disorder which raises the issue and not the nomenclature used to classify it."

Even where the evidence is in conflict, the question is one for the fact finders to determine. As this Court said in United States v Walker, 20 USCMA 241, 43 CMR 81 (1970):

". . . Resolution of a conflict in the evidence as to sanity is not different from resolution of other conflicts; all such conflicts are within the province of the fact finders. United States v Oakley, 11 USCMA 187, 29 CMR 3 (1960)."

The affirmative defense of insanity having been raised by the evidence, the military judge was obligated to instruct thereon. United States v Meador, supra.

We hold, therefore, that the military judge erred to the substantial prejudice of the accused in refusing to instruct on the issue of insanity.

The decision of the Court of Military Review is reversed. The record of trial is returned to the Judge Advocate General of the Navy. A rehearing may be ordered.

Judge DARDEN concurs.

QUINN, Chief Judge (dissenting):

Accepting, as the majority do, the statement in the 1969 Manual for Courts-Martial as an appropriate summary of the standard by which to test the sufficiency of the evidence for the purpose of instructions, I disagree with the half-Janus approach of the majority. The standard does not deal just with the quantum of evidence; it also requires assessment of the quality of the evidence. Specifically, it requires that the evidence be of such character as "could reasonably tend to show that the accused" is, or was at the time of the offense, insane. Manual for Courts-Martial, United States, 1969 (Revised edition), paragraph 122a.

Nothing in the testimony of the Government psychiatrists and nothing in the accused's testimony reasonably indicate that the accused suffered at the time of the offense from a disease, defect, or derangement of the mind. I agree, therefore, with the evaluation of the evidence as insufficient to require an instruction on insanity which was made by the military judge at trial and by the Court of Military Review below. Accordingly, I would affirm the decision of the Court of Military Review.