United States v Groves, 2 USCMA 541, 10 CMR 39 (1953) ; but compare United States v Stewart, 19 USCMA 417, 42 CMR 19 (1970)). Nonetheless, as it is commonly defined, "willful" is intended, I believe, only to distinguish acts that are intentionally done from those which are accidental, negligent, or involuntary. See People v Cummings, 29 Misc 2d 545, 216 NYS2d 207 (1961). The word is defined in Black's Law Dictionary, Revised Fourth Edition (1968), as follows:

UNITED STATES, Appellee

v

JOHN E. STEWART, Private, U. S. Army, Appellant

20 USCMA 300, 43 CMR 140

No. 23,189

January 29, 1971

*Captain William W. Rittenhouse* argued the cause for Appellant, Accused. With him on the brief were *Colonel Daniel T. Ghent* and *Captain Thomas R. Maher.*

*Captain James L. Rider* argued the cause for Appellee, United States. With him on the brief were *Colonel David T. Bryant, Major Edwin P. Wasinger,* and *Captain Benjamin G. Porter.*

Opinion of the Court

FERGUSON, Judge:

The accused was convicted of two specifications each of possession and sale of marihuana, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. His sentence, as approved by the Court of Military Review, extends to a bad-conduct discharge, total forfeitures, and confinement at hard labor for eighteen months. We granted review on the single issue of:

> Whether the military judge erred to the prejudice of the accused by declining to instruct as to specification 4 of the Charge that, if the accused was acting for the purchaser (CID agent) in obtaining and transferring marihuana, he must be acquitted.

The evidence for the Government consisted solely of the testimony of the two undercover agents (LaHart and Bailey) who allegedly each purchased marihuana from the accused on successive days, and a stipulation, between the parties, that the substance involved on each occasion was in fact marihuana. For the defense, only the accused, Stewart, testified. It is his testimony, with regard to the circumstances surrounding the alleged sale to Agent Bailey (specification 4), that gives rise to the granted issue.

LaHart, an agent of the Criminal Investigations Detachment, testified that while in the Red Cross Lounge at Madigan General Hospital, on February 1, 1969, he overheard Stewart speaking with some friends about having been in Seattle on the previous evening. "They were talking about marijuana." LaHart entered the conversation and disclosed that he personally was thinking about going to Seattle to buy some marihuana. "So, Stewart said he may be able to take care of me there at Madigan Hospital." Nothing further occurred that day. On February 3d, while LaHart was using the telephone adjacent to the hospital snack bar, Stewart allegedly approached LaHart to inquire whether he "would . . . like to buy some marihuana now and I told him yes, I would. So, at this time we went around to Ward 25b, I believe it was, and he got me one lid of mari-

**301**

juana. That's a plastic bag containing about so much marijuana and at this time I gave him $12 for it. At that time I left and turned it over to Mr. Nelson of CID at the end of the day when he picked me up."

On the following day, February 4th, LaHart testified, Stewart again approached him while the latter was standing in the mess hall line. They spoke together for a while and "I told him I had a friend coming over to visit me, female, and he asked me if she turned on, which means does she use marijuana, and I told him yes." Later, they met with Bailey, "an undercover girl agent for CID." LaHart then testified:

". . . Bailey mentioned to Stewart as we were walking down the hall before we went out that she had a party that night and that she may need some stuff and Stewart said well, I don't know if I can get you anything. So, he said I'll let you know later. So, then it was later in the afternoon. I was in the snack bar and Specialist Bailey was in the Red Cross Lounge and she came back over and said that Stewart said that he was going to get me a lid of marijuana in about half an hour. So, following that Stewart came over and came in and he said well, he wants to talk to me. He had two companions with him and he told me that the companions was leary of the girl.

"Q. That was Specialist Bailey?
"A. Specialist Bailey, yes. She was standing there in the hall. So, he said get the money off of her and she handed me 12 dollars and I handed it to Stewart and we went around to Ward 25b.

"Q. You and Stewart and two other guys?

"A. Yes. And we went around to Ward 25b where the other two left. I think they went into the ward. Stewart went into the side room and I waited in the hall. He came out and he gave me a lid of marijuana —no, he kept the lid of marijuana and we went back around and he

seen Specialist Bailey at the Red Cross Lounge and he met here [sic] and he gave her back $2.00 and said I'll sell it to you for 10. At this time she took the lid of marijuana and put it into her coat. I was sitting across from them and I could not hear any conversation. I seen him hand her the $2.00 back and she took the lid of marijuana and put it in her raincoat—into the pocket of the raincoat and at this time I got up from the Red Cross Lounge, went over, and back into the snack bar. That's the end of it.

"Q. So, you were present then on the 3d when you bought marijuana and on the 4th when Specialist Bailey brought [sic] what appeared to be marijuana?
"A. Yes, sir.

"TC: No further questions."

Agent Bailey testified that on February 4th she "was sent out to Madigan General Hospital by Mr. Nelson as undercover." She went on to state:

". . . And I was suppose [sic] to meet Specialist LaHart there. I went out there around twelve o'clock. I met Specialist LaHart and he wanted me to meet Stewart which he told me that he had informed him he had a girlfriend [sic] coming up to met [sic] him. So, we went out to the corridor by the snack bar and met Stewart. LaHart had told him that I was going to have a party that night and so Stewart asked me if he wanted—if I wanted him to get me a lid and I said yes.

"Q. What's a lid?
"A. A bag of marijuana. And so then Stewart said he'd have to go down and find out if he could get it from some of his friends. So, supposedly he went to check. He went outside and LaHart, and myself. We were smoking a marijuana cigarette.

"Q. Did he ask you to do this?
"A. Yes, sir.

"Q. And do you think he was sort of testing you?
"A. Yes, sir.

"Q. Okay,

"A. And LaHart and I faked it. Then we come [sic] back in and Stewart went somewhere in the hospital to find out if he could get it. LaHart and I walked back. LaHart went back into the snack bar and I went in to [sic] the Welcome Lounge. Then Stewart come [sic] in and told me it would be a while before we could get it and so I then went over and told LaHart in the snack bar. We sat in there for a while and then Stewart said it was time to go. So, we got up and went into the corridor and there was two other colored guys and Stewart told LaHart that he wanted to talk to him and so they went across the hallway and LaHart come [sic] back and said that the men were scared of me and they wouldn't talk to me and so I was suppose[d] to give him the money. Two fives and two ones to give to Stewart, so I gave them to LaHart and in turn LaHart gave it to Stewart.

"Q. Did you see LaHart give it to Stewart?

"A. Yes, sir.

"Q. And then what happened?

"A. And then the four of the men went down the corridor and I went back to the snack bar. It was about 10 minutes when they came back. It was Stewart and LaHart. The other two men weren't with them. Stewart and LaHart went into the latrine. I believe it was to check. LaHart wanted to check to see if it was marijuana. So LaHart went on back to the snack bar and Stewart and I were in the Welcome Lounge and I decided to put it in my raincoat pocket—the bag. I put it in my raincoat pocket. Stewart left and I went back into the snack bar where LaHart was.

"TC: Would you mark this Prosecution Exhibit 2 for Identification.

"Q. Now, who placed the bag of vegetable material in your raincoat pocket?

"A. Stewart.

"Q. Stewart placed it in there?

"A. Yes, sir.

"Q. And what did you do with it?

"A. I left it there until Mr. Nelson picked me up that night and I gave it to him.

"Q. You gave the bag to Mr. Nelson?

"A. Yes.

"Q. Now, is he a CID Agent?

"A. Yes, sir.

The accused testified that he first met LaHart in the lounge at the hospital on the first of February. They spoke about narcotics and the police in Seattle. LaHart brought the subject up first. He gave no indication at that time that he was interested in purchasing drugs. On the third of February, Stewart saw LaHart in the hallway and LaHart asked Stewart "if I could get him a lid and I said I'd look but I didn't." Stewart did obtain a cigarette which he believed contained marihuana and they smoked it together in a latrine. He denied selling LaHart a bag of marihuana on February 3d. The next day, Stewart again saw LaHart in the snack bar. LaHart was on the telephone and Stewart testified:

". . . [H]e motioned to me to stop. I guess he wanted to talk to me which I did. So, he was telling me about a girlfriend [sic] of his coming down. She wanted to score a lid for a party. So, he took me into the snack bar and met him [sic]. We were formally introduced. So, I told him I'd check on it and I left to go eat chow. I checked on it and couldn't find any there. I told them. I left again and left about two thirty and I told them it might be coming. So, about two thirty we went and took a walk outside of 24a, right in back of the lounge.

"Q. What happened then?

"A. Well, there was a cigarette lit.

"Q. What type of cigarette?

"A. I believe it was marijuana. Well, after we came back in we went to the snack bar and I went to check

**303**

on this deal. It was okay so I came back and told her. I called LaHart outside the snack bar and I told him that these two didn't like the other woman.

"LO: Didn't like what?

"A. This man. So, I told him to get the money from here [sic] and I go check it out which he did. So, we walked around the corner and he gave me the money. One ten and two ones. I went to 25a. I asked him to wait out in the hall.

"Q. Which is here? (Pointing to chart)

"A. Yes. I asked him to wait out in the hall. So, I went in and I made this purchase. I came out and we walked back to the lounge. We went to the latrine. He looked at it and said it was alright [sic]. So, I gave Bailey $2.00 back. I put the bag in her coat.

"Q. Did you make any profit from obtaining this lid of marijuana for Bailey?

"A. No, sir.

"Q. Is that why you gave her the $2.00 back?

"A. Yes, sir.

"Q. When you were outside earlier that afternoon and you said there was a cigarette lit that you assumed was marijuana, did LaHart smoke this?

"A. Yes, sir.

"Q. Did he inhale this?

"A. Yes, sir.

"DC: I have no further questions."

During an out-of-court hearing, defense counsel, citing "MaGinley—*32 CMR 844*" [United States v Maginley, 32 CMR 842 (AFBR 1962)], requested that the law officer instruct the court as follows:

". . . '[T]hat if you believed the accused obtained marijuana from— for LaHart and Specialist Bailey at LaHart's request and that LaHart gave him the money for this purpose, that the accused received no monetary benefits and this establishes at the most that the accused was an agent for the source and for LaHart and no sale [i]n the accepted sense of the word was effected that you must acquit the accused of Specification 4.' "

The law officer denied the motion on the ground that the accused was a principal in the transaction and thus liable as a seller.

In United States v Maginley, supra, the record reflected that one Manno requested that the accused "pick up some marihuana for him, Manno, from Noimi," a known source of supply. He gave the accused six dollars, the price of three packages of marihuana when bought direct from Noimi. About a week later, Manno went to the accused's home and picked up three packages of marihuana. In reversing Maginley's conviction on a charge of sale of marihuana to Manno, the board of review stated, at page 848:

". . . In United States v Horne, 9 USCMA 601, 26 CMR 381 [1958], though only possession was charged, the Court commented that a defendant who procured narcotics at an 'informer's' request from a seller, at no profit, was merely a messenger and could not be convicted of selling narcotics, citing Adams v United States, 220 F2d 297 (U.S.D.C. 5th Cir 1955)."

The board went on to hold:

"Using the words 'sale' or 'sell' in their 'ordinary and popular sense' (Affronti v U.S., 145 F2d 3, 9 (C.A.C. 8th Cir 1944)), we find accused here was, at the most, an agent for the buyer Manno with no more than a casual knowledge of the seller Noimi, and that no 'sale', in the accepted sense of the word, was effected between accused and Manno in October 1960."

Because the board of review in *Maginley* also held that under the pleadings of that case no lesser included offense, in the sale alleged, existed or was in issue, the Judge Advocate General of the Air Force certified the case to this Court on the question of whether

the board was correct in holding that neither wrongful and unlawful possession, procurement or transfer of marihuana, nor any other offense was included in the offense alleging wrongful sale. We affirmed the board's determination that no lesser included offense involving marihuana was included in a specification which contained only a bare allegation of its sale. United States v Maginley, 13 USCMA 445, 32 CMR 445 (1963).

In United States v Horne, 9 USCMA 601, 603, 604, 26 CMR 381 (1958), we said:

"It has been held that a conviction procured by entrapment is in violation of the due process provision of the Fifth Amendment. Banks v United States, 249 F2d 672 (CA9th Cir) (1957). It has also been held that where the defendant obtained narcotics at the request of a Government informer, under surveillance of narcotics officers and acting at their direction, and where the defendant made no profit thereby, defendant was merely the messenger of the seller and could not be convicted of selling narcotics. Adams v United States, 220 F2d 297 (CA5th Cir) (1955)."

See also United States v Maginley, 32 CMR 842, supra.

In the case at bar the accused testified that he acted as a go-between for Agent LaHart in the purchase of the marihuana for Agent Bailey on February 4th. He accepted $12.00 from LaHart, made the purchase from two other individuals, and returned $2.00 to Bailey when he put the bag of marihuana in her coat. He denied that he made a profit on the transaction.

When an affirmative defense (United States v Horne, supra, and United States v Maginley, 32 CMR ■ 842, supra) is raised by the evidence, the military judge is required *sua sponte* to instruct thereon. United States v Meador, 18 USCMA 91, 39 CMR 91 (1969); United States v Oisten, 13 USCMA 656, 33 CMR 188 (1963), and cases cited at page 662. It matters not that the accused is the sole source of the evidence. United States v Evans, 17 USCMA 238, 242, 38 CMR 36 (1967). Insofar as the reasonable character of his explanation is concerned, this determination is for the members of the court-martial to decide under proper instructions. See United States v Jones, 13 USCMA 635, 640, 33 CMR 167 (1963); United States v Thomas, 20 USCMA 249, 43 CMR 89 (1971).

We hold, therefore, that the military judge erred to the prejudice of the accused by declining to instruct ■ struct as to specification 4 of the Charge (wrongful sale of marihuana on February 4th), that if the accused was acting for the purchaser (CID agent) in obtaining and transferring marihuana, he must be acquitted. United States v Maginley, 32 CMR 842, supra, and United States v Horne, supra.

The decision of the Court of Military Review affirming the accused's conviction of specification 4 of the Charge is reversed. The record of trial is returned to the Judge Advocate General of the Army. The Court of Military Review may reassess the sentence on the basis of the remaining findings of guilty or a rehearing on specification 4 of the Charge may be ordered.

Chief Judge QUINN and Judge DARDEN concur.