# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
SALUSSOLIA, FLEMING, and WALKER
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Chief Warrant Officer Three CASEY B. ROBERTS**
**United States Army, Appellant**

ARMY 20150023

Headquarters, 25th Infantry Division
Gregory A. Gross, Military Judge
Colonel Mark A. Bridges, Staff Judge Advocate

For Appellant: Captain Benjamin J. Wetherell, JA; Brian Pristera, Esquire (on brief); Captain Zachary Gray, JA; Brian Pristera, Esquire (on reply brief).

For Appellee: Colonel Steven P. Haight, JA; Lieutenant Colonel Wayne H. Williams, JA; Major Virginia Tinsley, JA; Captain Brian Jones, JA (on brief).

11 December 2019

-----------------------------------------------------------------
MEMORANDUM OPINION ON FURTHER REVIEW
-----------------------------------------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

FLEMING, Judge

We find appellant's trial defense counsel were not ineffective for failing to file a motion to compel the appointment of an expert consultant, and even if counsel were ineffective, their performance did not prejudice appellant. The case's lengthy procedural history follows.

Appellant's first court-martial, *United States v. Roberts*, Army 20140732, ended in mistrial [Roberts I]. Subsequently, a general court-martial composed of officers convicted appellant, contrary to his pleas, of sexual assault and indecent visual recording in violation of Articles 120 and 120c, UCMJ and sentenced appellant to a dismissal, confinement for three years, forfeiture of all pay and allowances, and a reprimand [Roberts II]. The convening authority suspended the adjudged forfeitures and waived the automatic forfeitures for a period of six months, but otherwise approved the sentence as adjudged.

Appellant initially raised three assignments of error, all of which, at least in part, were premised on the lack of completeness of the Roberts II Record of Trial (ROT) because the Roberts I ROT was not attached. Because it appeared the convening authority did not review the Roberts I ROT prior to taking action on Roberts II, we set aside the action and returned the case for a new staff judge advocate recommendation (SJAR) and convening authority action (Action) with "direction that before [issuing] any new SJAR and action," the Roberts I ROT must be attached to the Roberts II ROT. *United States v. Roberts*, ARMY 20150023, 2017 CCA LEXIS 442 (Army Ct. Crim. App. 30 June 2017) (summ. disp.).

In January 2018, a new SJAR and Action were issued and the case was returned to this court. After noting the government only attached a summarized transcript of Roberts I to the Roberts II ROT, we ordered the government to provide a verbatim transcript of Roberts I. *United States v. Roberts*, ARMY 20150023 (Army Ct. Crim. App. 11 April 2018) (Order). The government was unable to do so.

Based on the government's failure to provide a Roberts I verbatim transcript, we held that the Roberts II ROT was also not verbatim. *United States v. Roberts*, ARMY 20150023, 2018 CCA LEXIS 437 (Army Ct. Crim. App. 7 June 2018) (memorandum opinion). We then set aside the SJAR and action issued in January 2018 and returned the case to the convening authority "to either (1) take a new action approving only such much of the sentence that could be adjudged by a special court-martial under R.C.M. 1103(f)(1); or (2) direct a rehearing under R.C.M. 1103(f)(2)." *Id*. at *12.

In November 2018, the convening authority again took Action, electing our first proposed option, and approved only so much of the sentence as "extending to a reprimand, forfeiture of $3483 [dollars] pay per month for six months, and confinement for six months."[1]

Appellant's case is again pending review before this court pursuant to Article 66, UMCJ. Appellant now raises a single assignment of error, which merits discussion, but no relief.

## BACKGROUND

Appellant was convicted of sexually assaulting SB at his house in the early morning hours by penetrating her vagina with his penis while she was asleep, unconscious, or otherwise unaware, and wrongfully photographing her private area without her consent. For several years prior to the offenses, appellant and his wife

---

[1] The Action also affirmed any prior deferral or waiver actions taken on any adjudged or automatic forfeitures. Appellant was also credited with his served confinement since the imposition date of his initial sentence.

were extremely close friends with SB and her husband, Chief Warrant Officer Three (CW3) AB.

The evening prior to the offenses the four friends attended a hail-and-farewell ceremony at a restaurant. Appellant and CW3 AB drank alcohol. After the ceremony, the two men went to a nearby bar to continue to socialize and consume alcohol. After the ceremony, appellant's wife and SB separated from their spouses and decided to obtain matching feather tattoos at a tattoo parlor. The two women did not consume alcohol at the restaurant or during the entirety of the events surrounding the offenses.

Between approximately 2200 and 2300 hours, appellant and CW3 AB left the bar. Chief Warrant Officer Three AB drove appellant home and then drove home himself. After arriving home, appellant fell asleep on his first floor couch. At approximately 0200 hours, appellant's wife and SB arrived at the Roberts' house. Appellant remained on the first floor couch. The two women decided to go upstairs to the second floor to sleep in the bed in the master bedroom.

Prior to leaving her house for the evening, SB had not planned to sleep at the Roberts' house. SB, who had a prescription for Xanax, was concerned she could not sleep without her medication.[2] Appellant's wife, who also had a Xanax prescription, gave SB a .5 milligram dosage Xanax pill. Both women took a Xanax pill, talked for a few minutes, and fell asleep in the bed in the master bedroom.

SB testified her next memory was waking up on the first floor couch to appellant penetrating her vagina. SB stated she was lying on the couch on her back, naked from the waist down. She immediately saw appellant on top of her, said his name, and pushed him away. Appellant told SB that "I thought you were [my wife], and kept repeating that she, SB, had walked downstairs." Appellant helped SB put on her clothes and walked her back upstairs to the master bedroom. SB testified she felt disoriented, tired, and fell back to sleep in the bed in the master bedroom. After waking at approximately 0800 hours, SB departed the house without discussing the incident with appellant or his wife. Later that day, SB told her husband that she awoke to appellant penetrating her vagina without her consent.

---

[2] Xanax is "a trademark for a preparation of the drug alprazolam," a benzodiazepine used as a tranquilizer. *Dorland's Illustrated Medical Dictionary* 1857, 53 (Elizabeth J. Taylor ed., W.B. Saunders Company 1988) (1900) (*Dorland's Medical Dictionary*). Alprazolam "has the same general properties as diazepam," a sedative, "also used as a skeletal muscle relaxant, to produce anesthesia, as an anticonvulsant, and in the management of alcohol withdrawal symptoms and delirium tremens." *Dorland's Medical Dictionary* 53, 466.

The next day, a series of text messages commenced between appellant and CW3 AB regarding the incident. Appellant initially stated he did not know how SB came to be on the couch but thought SB was his wife. When pressed for the truth by CW3 AB, appellant stated, "TRUTH! I WOKE UP TO HER!" Appellant implored CW3 AB, "I beg you. I understand something fucked up happened and im [sic] not shirking some of the responsibility, but if anyone else finds out I'm sure ill [sic] go to jail until this gets sorted out." During a subsequent telephone conversation, CW3 AB testified that appellant admitted to going upstairs to get SB from the bedroom. Appellant claimed he thought he was retrieving his wife, not SB.[3]

Approximately a week later, SB reported to Criminal Investigation Command (CID) that she awoke to appellant penetrating her vagina without her consent. During the CID investigation, special agents seized appellant's cellphone. A CID digital forensic examiner (DFE) located, in the unallocated space of a secure digital card from appellant's cellphone, three deleted sexually explicit photographs of SB on appellant's couch. The photographs depicted SB with her eyes closed, nude from the waist down, tee-shirt pulled up, and her breasts and genitilia fully exposed.

During the pre-trial phase of Roberts I, appellant requested the convening authority appoint the defense with an expert consultant in "forensic toxicology." The convening authority denied the request. Defense counsel then filed a motion to compel the appointment of the expert consultant. On appeal, as stated in the government's brief, "there is nothing in either the [Roberts I ROT] or the current record [in Roberts II] that indicates [whether] the military judge ruled on the defense motion."[4] The defense did not file a motion for an expert consultant in forensic toxicology in Roberts II.

---

[3] A two to three inch height difference and ten to fifteen pound weight difference existed between SB and appellant's wife.

[4] We pause to note an affidavit from appellant's trial defense counsel, attached for our consideration during the appellate phase pursuant to government request, asserted the military judge denied the defense motion to compel an expert consultant in Roberts I. We agree with the government that there is no documentation of the military judge's alleged denial in the Roberts I or II ROTs. As discussed in-depth in our previous memorandum opinion, the Roberts I ROT was lacking numerous required items, to include: motions, witnesses' testimony, counsels' argument, and rulings. *See United States v. Roberts*, ARMY 20150023, 2018 CCA LEXIS 437 (Army Ct. Crim. App. 7 June 2018) (memorandum opinion). We need not determine, however, if the military judge denied the defense motion in Roberts I because it does not impact our analysis of appellant's trial defense counsel's performance in Roberts II.

Having finally addressed the multiple errors regarding the completeness of appellant's ROT in our prior issuance of a summary disposition, an order, and a memorandum opinion, the only assignment of error now alleged by appellant is that his defense counsel were ineffective for failing to file a motion to compel an expert consultant in "psychiatry" or "toxicology" in Roberts II.

## LAW AND ANALYSIS

The Sixth Amendment guarantees an accused the right to the effective assistance of counsel. *United States v. Gooch*, 69 M.J. 353, 361 (C.A.A.F. 2011) (citing *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001)). To establish that his counsel was ineffective, appellant must satisfy the two-part test, "both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice." *United States v. Green*, 68 M.J. 360, 361-62 (C.A.A.F. 2010) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). We review both prongs of the *Strickland* test de novo. *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009) (citing *United States v. Anderson*, 55 M.J. 198, 201 (C.A.A.F. 2001) and *United States v. Wiley*, 47 M.J. 158, 159 (C.A.A.F. 1997)). In evaluating the first *Strickland* prong, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. "We also are constrained by the principle that strategic choices made by trial defense counsel are 'virtually unchallengeable' after thorough investigation of the law and the facts relevant to the plausible options." *United States v. Akbar*, 74 M.J. 364, 371 (C.A.A.F. 2015) (citing *Strickland*, 466 U.S. at 690-91).

Appellant asserts his defense counsel were ineffective for failing to file a motion to compel an expert consultant because "there was no expert testimony regarding forensic psychiatry [and] the possible effects of Xanax, [such] as blacking out, passing out and sleep walking."[5] After reviewing the entire ROT and affidavits submitted by appellant's trial defense counsel, we find appellant's trial defense

---

[5] Blackouts are "periods for which a person is unable to remember critical elements of events, or even entire events, that occurred while he or she was intoxicated." Aaron M. White, *What Happened? Alcohol, Memory Blackouts, and the Brain*, 27 ALCOHOL RES. & HEALTH No. 2, 186, 188 (2003). "Blackouts represent episodes of amnesia, during which subjects are capable of participating even in salient, emotionally charged events—as well as more mundane events—that they later cannot remember (Goodwin 1995)." *Id.* People experiencing a blackout are "able to keep information active in short-term memory for at least a few seconds. As a result, they can often carry on conversations, drive automobiles, and engage in other complicated behaviors. Information pertaining to these events is simply not transferred into long-term storage," such that blacked out people may "not remember what they said or did 5 minutes earlier." *Id.*

counsel's conduct and strategic choices fell within the wide range of reasonable professional assistance.

First, we pause to clarify the difference between an expert consultant and an expert witness. Although an expert consultant frequently morphs into an expert witness at trial, like a caterpillar into a butterfly, those are separate roles controlled by distinct rules and legal tests. *See* Rule for Courts-Martial 703; Military Rule of Evidence 702; *United States v. Gonzalez*, 39 M.J. 459, 461 (C.M.A. 1994) (providing a three-prong standard to demonstrate the necessity of an expert consultant); *United States v. Houser*, 36 M.J. 392 (C.M.A. 1993) (articulating six factors for determining admissibility of expert testimony). Despite appellant blurring the distinction between an expert consultant and witness and a toxicologist and psychiatrist, we will nevertheless address the underlying substance of appellant's alleged error – that his counsel failed to present evidence to support a theory that SB's Xanax usage "could have caused [her] to blackout, walk down the stairs, initiate a sexual encounter, and then come out of the blackout and be confused as to why she [was] involved in a sexual encounter."

It is important to recognize that a qualified expert may testify as to the causes and effects of a possible "blackout," but the factual determination as to SB's status was within the sole province of the fact finder. *See United States v. Walker*, 20 U.S.C.M.A. 241, 246, 43 C.M.R. 81, 86 (1971) (citing *United States v. Oakley*, 11 U.S.C.M.A. 187, 29 C.M.R. 3 (1960) for the proposition that "[r]esolution of a conflict in the evidence . . . [is] within the province of the fact finders."). The three sexually explicit photographs of SB on appellant's couch were admitted into evidence by the government for the panel's consideration.

We have closely reviewed the three sexually explicit photographs depicting SB with her eyes closed and her body in a catatonic state on appellant's couch. The photographs do not show SB awake and engaged with her surroundings in a possible "blackout" state, but instead depict highly probative government evidence that she was asleep, unconscious, or otherwise unaware. The trial counsel clearly appreciated the high probative value of the photographs, beginning the government's opening statement, closing argument, and rebuttal argument with the photographs and the adage that a picture was worth a thousand words. In closing argument, the trial counsel challenged the panel, asking "[w]hat better evidence [than the photographs] do you have to prove [appellant is] guilty?"

Defense counsel faced the strategic challenge of either not addressing the damaging photographs or presenting an alternate theory as to SB's status at the time the photographs were taken. If defense counsel had presented evidence to support a theory that SB's status was only "blacked out" because of her Xanax usage, this would have created a dangerous tightrope act for appellant, balancing between conceding that Xanax affected SB—which was the entire government theory—and

6

arguing that any effect was limited to SB only being "blacked out," rather than passed out.

Instead, defense counsel employed a tactically-sound theory—completely divergent from the government's theory—that SB was not affected at all by the Xanax but she instead engaged in consensual and adulterous sexual activity with appellant. This theory did not require any defense expert testimony on the effects of Xanax.[6] Defense counsel told the military judge that "our case is that [SB] came down the stairs voluntarily and so awoke [appellant] and engaged in sexual conduct with him." Defense counsel asserted SB's lack of memory surrounding the events was not credible and she was lying regarding her nefarious behavior to protect her marriage and her friendship with appellant's wife.

This defense theory, ironically, was supported by testimony from SB and CW3 AB. According to both witnesses, SB possessed a prescription for a .5 milligram dosage of Xanax and had frequently used Xanax in that dosage, without prior incidents of inability to recall events or sleepwalking. Further, SB had not consumed any alcohol within the timeframe of the offenses, which might have altered her reaction to her normal Xanax dosage. Defense counsel also established through the cross-examination of SB that she had taken a .5 milligram dosage of Xanax prior to her testimony at the Article 32, UCMJ hearing and she had been completely coherent.

Trial defense counsel's affidavits explain that the "defense was a consent defense in light of the photographs" and that the photographs actually "exemplified sexual behavior" by SB, who consented to dramatically posing for appellant. In support of this theory, defense counsel admitted into evidence a photograph sent to appellant and CW3 AB, approximately eighteen months prior to the offenses, depicting SB and appellant's wife pulling up their shirts and partially exposing their breasts.[7]

The panel rejected, as do we, the defense theory of the photographs. We pause to highlight, however, in light of the high probative value of the photographs for the government, that defense counsel faced the Mount Everest of uphill battles to

---

[6] We note the government did not present any expert testimony regarding the effects of Xanax despite that being the entire theory of its case.

[7] Whereas the military judge admitted this photograph into evidence for the defense, we need not decide, but pause to question, the probative value of a photograph depicting SB's sexual activity from a timeframe remotely removed from the offenses. In other words, defense counsels' ability to articulate the probative value of this defense-favorable, sexually explicit photograph of SB, is indicia that their performance clearly fell within the wide range of reasonable professional assistance.

negate the government's adage that the three photographs were worth a thousand words. Defense counsels' theory of consent, and more importantly, their presentation of testimony and evidence supporting that theory, demonstrates their performance clearly fell within the wide range of reasonable professional assistance. We could easily find, if required, that defense counsel made the most with what they had.

While finding appellant's trial defense counsels' performance did not fall below an objective standard of reasonableness, we are convinced that even if counsels' performance was ineffective, it did not give rise to a "reasonable probability" the result of the proceeding would have been different. The evidence appellant asserts his defense counsel failed to present at trial was of such minimal probative value, in light of the three photographs supporting SB's credible testimony, that there is no reasonable probability its presentation at trial would have created a different result in the proceeding.[8] Under *Strickland's* two-prong test, appellant fails to meet his burden that his trial defense counsel were ineffective.

## CONCLUSION

The findings of guilty and sentence are AFFIRMED.

Judge SALUSSOLIA and Judge WALKER concur.

FOR THE COURT:

MALCOLM H. SQUIRES JR.
Clerk of Court

---

[8] We also note these three photographs gravely undermined any plausibility that appellant mistakenly believed SB was his wife. The entire left side of SB's lower stomach is covered with a tattoo of four colorful hibiscus flowers, a tattoo which appellant's wife did not possess. SB's stomach tattoo of hibiscus flowers is not to be confused with the matching feather tattoos SB and appellant's wife obtained the evening prior to the offenses. SB's new feather tattoo does not appear in any of the photographs.